**AMERICAN EMPLOYERS' INSURANCE CO., et al., Plaintiffs Cross-claim Defendants,**

v.

**DeLORME PUBLISHING CO., INC., Defendant Third–Party Plaintiff,**

v.

**Acadia Insurance Co., Third–Party Defendant Cross-claim Plaintiff.**

**No. Civ. 98–179–P–C.**

United States District Court, D. Maine.

Jan. 29, 1999.

insurer to defend.

John S. Whitman, Richardson, Whitman, Large & Badger, Portland, Maine, for plaintiff.

Gordon Scott, Eaton Peabody, Augusta, Maine, for defendant.

James M. Bowie, Thompson & Bowie, Portland, Maine, for third-party defendant.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This declaratory judgment action was brought by a counterclaim defendant's liability insurer seeking a declaration that it had no duty to defend against the trademark infringement counterclaim brought by one of the counterclaim defendant's competitors. The central issue is whether the facts alleged in the underlying trademark infringement counterclaim constitute an "advertising injury" which would trigger a duty to defend under a commercial general liability policy. More specifically, presently before the Court are three motions for summary judgment that require the Court to determine which liability insurer of the counterclaim defendant, DeLorme Publishing Company, Inc. ("DeLorme"), if any, had a duty to defend in the underlying trademark infringement action. DeLorme contends that American Employers Insurance Co. ("American"), Commercial Union Insurance Co. ("Commercial"), and Acadia Insurance Co., ("Acadia") were obligated, pursuant to their General Commercial Liability and Umbrella insurance policies executed by the companies with DeLorme, to defend it in the underlying litigation.

## I. BACKGROUND

This insurance coverage action arises out of an underlying trademark dispute between Rand McNally Company ("Rand McNally") and DeLorme.[1] Rand McNally manufactures, distributes, promotes, and sells a wide variety of cartographic products and services. Rand McNally Counterclaim, Complaint (Docket No. 1), Exhibit C ("Rand McNally Counterclaim") ¶ 5. DeLorme is a company that "principally engages in the design, printing, and sale of atlases and maps, in the development and sale of computer mapping software and databases, and, recently, in the design and sale of hardware that can be used in conjunction with its computer mapping software." Affidavit of Thomas Jensen, Vice President, Contracts and Legal, (Docket No. 15) ¶ 2; Plaintiffs' Statement of Undisputed Material Facts In Support of Motion for Summary Judgment ("Plaintiffs' Statement of Facts") (Docket No. 19) ¶ 1. The companies are direct competitors of each other, Rand McNally Counterclaim ¶ 2, and in recent years both companies developed and marketed electronic cartographic products to be used in conjunction with mapping software. Rand McNally Counterclaim ¶¶ 5, 6, 8. The innovative cartographic device can be plugged into a portable computer, placed on the dashboard of a vehicle, and used in conjunction with mapping software to enable travelers to navigate. Plaintiffs' Statement of Facts ¶ 2; Memorandum of DeLorme Publishing Co., Inc. In Support of Motion for Summary Judgment ("DeLorme's Motion for Summary Judgment") (Docket No. 13) at 4. According to the allegations in its counterclaim, Rand McNally's best selling electronic cartographic product is its "TRIPMAKER®" electronic cartographic product, introduced in August 1994. Rand McNally's Counterclaim ¶ 9. At some point in 1996, DeLorme also developed and marketed an electronic cartographic product to be packaged and sold in conjunction with its mapping software, "STREET ATLAS USA®." DeLorme named its product "TRIPMATE." See id; Statement of Undisputed Material Facts of DeLorme Publishing Co., Inc. ("DeLorme's Statement of Facts") (Docket No. 14) ¶¶ 8, 9; Plaintiffs' Statement of Facts ¶ 2; Rand McNally Counterclaim ¶¶ 20, 21.

■ Determination of the duty to defend under Maine law is based exclusively on the facts as alleged, rather than as they actually are. See Travelers Indem. Co v. Dingwell, 414 A.2d 220, 224 (Me.1980) (citing Lee v. Aetna Cas. & Sur. Co., 178 F.2d 750 (2d Cir.1949). Accordingly, the allegations in Rand McNally's counterclaim as to

---

1. See DeLorme Publishing Co. v. Rand McNally & Co., Civil No. 97–46–P–C.

the acts upon which the trademark infringement claim was based include the following:

19. DeLorme, on information and belief, has sold electronic cartographic products under many names, including AAA Map'N'GO®, GLOBAL EXPLORER®, MAPEXPERT®, and STREET ATLAS USA®. For more than a year, DeLorme has marketed an electronic product called STREET ATLAS USA® that features, *inter alia*, street maps of most areas of the United States and competes directly with Rand McNally's electronic cartographic products. Like Rand McNally's electronic cartographic products, DeLorme's STREET ATLAS USA® product works on the "Windows" operating system that is installed on most of the personal computers and laptops owned by consumers in the United States.

20. On information and belief, in or before December 1996, DeLorme began marketing its "STREET ATLAS USA®" electronic cartographic product together with a Global Positioning System ("GPS") receiver. The receiver is of a size and shape similar to a computer mouse, and is intended to be plugged into a personal computer or laptop computer.

21. DeLorme markets the "bundled products—the STREET ATLAS USA® product and the GPS receiver—together in packaging that prominently features the TRIPMATE trademark, and only in much smaller letters and less prominent type indicates the STREET ATLAS USA® trademark.... " In or before December 1996, DeLorme began selling TRIPMATE electronic cartographic products in interstate commerce in such packaging.

22. On account of Rand McNally's extensive advertising, promotion and sales of the TRIPMAKER® electronic cartographic product, and Rand McNally's status as the number one product in the "Windows" trip-planning category, De-Lorme was well aware in or before December 1996, when it began marketing TRIPMATE electronic cartographic products, of Rand McNally's prior use of the TRIPMAKER® mark. Indeed, in view of the competitive relationship between DeLorme and Rand McNally—and particularly the direct competition between their electronic cartographic products—DeLorme was almost certainly aware of the popularity, consumer goodwill, and name recognition enjoyed by Rand McNally's TRIPMAKER® electronic cartographic product.

23. On information and belief, De-Lorme intentionally chose to bundle STREET ATLAS USA® with its GPS receiver in packaging prominently featuring the TRIPMATE trademark in order to (i) trade off Rand McNally's goodwill in the TRIPMAKER® trademark; (ii) cause consumers to associate the TRIPMATE mark, STREET ATLAS USA® and/or DeLorme's GPS receiver with the mark TRIPMAKER®; (iii) cause consumers to believe that De-Lorme's TRIPMATE electronic cartographic products are a brand extension of Rand McNally's TRIPMAKER® electronic cartographic product or are otherwise related to Rand McNally's TRIPMAKER® electronic cartographic product; and (iv) commercially benefit from the widespread name recognition and fame of the TRIPMAKER® trademark.

24. As shown below, the TRIPMATE package evidenced DeLorme's intent to benefit from Rand McNally's goodwill. The trademark of the product in direct competition with Rand McNally's electronic cartographic products—the STREET ATLAS USA®—is minimized and located in a corner of the package, whereas the TRIPMATE mark is featured prominently on the front and other panels of the package in a type style extremely similar to that of Rand McNally's TRIPMAKER® trademark.

27. DeLorme's unlawful and unauthorized use of the TRIPMATE trademark in connection with electronic cartographic products has already caused actual confusion. A Best Buy store promotional insert in the January 26, 1997, Sunday editions of many newspapers across the United States—print advertisements that were circulated to millions of consumers—promoted DeLorme's TRIPMATE electronic cartographic products, but misidentified them as the "DeLorme Tripmaker CD" . . . .

30. DeLorme has heightened this likelihood of confusion by selecting such a similar trademark, applying it to such similar goods, targeting its TRIPMATE electronic cartographic products at the same consumers, marketing such products in the same channels of trade, and advertising them in the same media. Indeed, retail store advertisements, mail order catalogs, and magazines often promote the TRIPMAKER® and TRIPMATE electronic cartographic products on the same page, sometimes in close proximity to each other, and/or classify the products in the same category.

On January 15, 1997, DeLorme received a letter from a representative of Rand McNally asserting a claim that DeLorme's trademark "TRIPMATE" for its Global Positioning Satellite navigation product would infringe Rand McNally's mark "TRIPMAKER®." Plaintiffs' Statement of Facts ¶ 3.

Fearing that Rand McNally would choose to sue in the Northern District of Illinois, where its principal place of business is located, DeLorme commenced an action on February 12, 1997, against Rand McNally seeking a declaration that DeLorme was not infringing Rand McNally's "TRIPMAKER®" trademark. Plaintiffs' Statement of Facts ¶ 5. On May 12, 1997, Rand McNally filed an answer and counterclaim and alleged, among other claims, that DeLorme had violated sections 32(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a). DeLorme's Statement of Facts ¶ 6; Acadia's Statement of Material Facts As To Which There is No Dispute ("Acadia's Statement of Facts") (Docket No. 17) ¶¶ 6–9; Rand McNally Counterclaim ¶¶ 35, 38. The claims were set forth by Rand McNally in the counterclaim as follows:

## COUNT I

### TRADEMARK INFRINGEMENT UNDER LANHAM ACT SECTION 32

. . .

34. The foregoing acts of DeLorme constitute unlawful infringement of Rand McNally's registered TRIPMAKER® trademark in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

## COUNT II

### FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION UNDER LANHAM ACT SECTION 43(a)

. . .

38. The foregoing acts of DeLorme constitute false designation of origin and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Rand McNally requested a permanent injunction, an equitable accounting for profits arising from DeLorme's sale of "TRIPMATE" electronic cartographic products, and attorneys' fees. Rand McNally Counterclaim, Prayer for Relief at 31–32.

DeLorme first notified its litigation insurers, including American, Commercial, and Acadia, by letter on February 24, 1997, that Rand McNally had asserted a claim against DeLorme for damages for trademark infringement. DeLorme's Statement of Facts ¶ 10; Plaintiffs' Statement of Facts ¶ 7. After Rand McNally filed its counterclaim, DeLorme renewed its request for coverage. *Deposition of Richard I. Thompson,* Vice President of Finance and Administration, DeLorme Publishing Company, Inc. at 21–25. DeLorme sought defense coverage in the

Rand McNally action pursuant to several insurance policies. The first insurance agreement is a Commercial General Liability ("CGL") policy issued by American to DeLorme to provide coverage according to its terms for January 1, 1996, through January 1, 1997. Plaintiffs' Statement of Facts ¶ 7. The second policy is an Umbrella policy and was issued by Commercial to DeLorme to provide coverage for January 1, 1996 until January 1, 1997. *Id.* The final three policies were issued to DeLorme by Acadia and include a Miscellaneous Professional Liability ("MPL") policy, a CGL policy, and an Umbrella policy. *Id.* The coverage period for the policies issued by Acadia provide DeLorme coverage according to its terms for January 1, 1997, until January 1, 1998. *Id.*

American and Commercial rejected DeLorme's tender of the defense by letter dated June 24, 1997. Acadia's Amended Answer and Cross-claim (Docket No. 8), Exhibit A. DeLorme disagreed with and challenged this refusal by letter dated August 27, 1997. *Id.*, Exhibit B. On July 14, 1997, Acadia rejected the tender under its CGL policy but agreed to pay, pursuant to its MPL policy, all defense costs, save for the deductible under the MPL policy of $25,000, incurred by DeLorme in the litigation after Rand McNally filed its counterclaim. Acadia's Statement of Facts ¶ 18; Plaintiffs' Statement of Facts ¶ 9.

Acadia reserved its rights under the MPL policy, and DeLorme assigned to Acadia any and all rights it may have to recover those expenses from Commercial.[2] Acadia's Amended Answer and Cross-claim, Exhibit D.

DeLorme subsequently settled its lawsuit with Rand McNally with no money exchanged. DeLorme contends that $80,-550.62 was incurred in the period between receipt of Rand McNally's claim and the filing of Rand McNally's counterclaim. Answer and Counterclaim of DeLorme Publishing Co., Inc. (Docket No. 2) ¶ 2(a). During the period between the filing of the counterclaim and the conclusion of the litigation, DeLorme incurred defense costs of $255,991.03. *Id.* ¶ 2(b). Pursuant to its MPL policy, Acadia paid the difference of $255,991.03 and the $25,000 deductible, equaling $230,991.03 of that sum. Plaintiffs' Statement of Facts ¶ 11.

American and Commercial filed this suit against DeLorme seeking a declaration that they had no duty to defend DeLorme in the underlying suit against Rand McNally. Complaint (Docket No. 1). DeLorme filed a counterclaim against the Plaintiffs and filed a third-party complaint against Acadia, contending that it was owed a duty to defend the allegations in the Rand McNally counterclaim by American, Commercial, and Acadia in this action.[3] (DeLorme's Answer and Counter-

---

2. In its Amended Answer, Acadia asserts that American and Commercial are related corporations. *Amended Answer, Cross-claim* ¶ 2. American and Commercial do not dispute this fact.

3. DeLorme characterized its claim against Acadia as a counterclaim and cited to Federal Rule of Civil Procedure 13. The claim, however, is properly characterized as a third-party complaint and brought pursuant to Federal Rule of Civil Procedure 14. Fed.R.Civ.P. 14(a) provides that a defending party may, as a third-party plaintiff, implead a person not a party to the action "who is or who may be liable to him for all or part of the plaintiffs' claim against him." Because Acadia was not a party to the action at the time the pleading was filed and Acadia may be liable to DeLorme for all or part of American and Com-

mercial's claim against DeLorme, a third-party complaint is proper. *See* Fed.R.Civ.P. 14(a).

The Court has jurisdiction over the subject matter of American and Commercial's declaratory judgment action against DeLorme pursuant to 28 U.S.C. § 1332. The parties are diverse in that American and Commercial are related corporations organized and existing under the laws of Massachusetts and DeLorme is a corporation organized and existing under the laws of the state of Maine. DeLorme's Amended Answer and Counterclaim, Counterclaim ¶ 2. In addition, the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332. Furthermore, because the third-party complaint arises out of the same core of operative facts as the declaratory judgment action, the Court has supplemental

claim). Acadia disputed that it owed a duty to defend to DeLorme pursuant to its CGL policy and subsequently filed a cross-claim against American and Commercial, advancing that American and Commercial had a duty to defend DeLorme pursuant to their CGL policies, that these companies were DeLorme's primary insurers, and, therefore, were required to reimburse Acadia for the funds expended pursuant to Acadia's MPL policy.

## II. DISCUSSION

Since the underlying lawsuit has been settled at no cost, indemnification under the policy is not an issue. The question here is whether American, Commercial, and Acadia had a duty to defend the underlying action and are, therefore, obligated to pay the costs of defense. Resolution of this issue requires the Court to resolve the following questions: 1) whether a claim for trademark infringement is an "advertising injury" under the CGL policy; 2) whether a suit for trademark infringement wherein the counterclaim defendant requests an accounting is a suit for damages as defined by the CGL policy; and 3) whether any exclusions contained in the CGL policy apply in the present case that preclude coverage.

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). Once the moving party has come forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by pro-

viding properly supported evidence of disputed material facts that would require trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986).

The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The Court will not, however, pay heed to "conclusory allegations, improbable inferences [or] unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

## A. Policy Coverage.

The CGL policies issued by American and Acadia and the Umbrella policy issued by Commercial all require the insurers to defend DeLorme in any action for liability caused by an "advertising injury offense." The policies provide coverage for "sums that the insured becomes legally obligated to pay as damages because of . . . advertising injury to which this insurance applies." American's CGL Policy, Complaint (Docket No. 1), Exhibit A at 3; Commercial's Umbrella Policy, Complaint (Docket No. 1), Exhibit B at 1; Acadia's CGL Policy, DeLorme's Answer and Counterclaim (Docket No. 2), Exhibit C at 4. In addition, to qualify as an "advertising injury," the injury must have been caused by an offense committed in the course of advertising. American's CGL Policy, Complaint, Exhibit A at 3; Commercial's Umbrella Policy, Complaint, Exhibit B at 1; Acadia's CGL Policy, DeLorme's Answer and Counterclaim, Exhibit C at 5. Furthermore, an

jurisdiction over its subject matter. *See Dery v. Wyer,* 265 F.2d 804 (2d Cir.1959); *Gauthier v. Crosby Marine Serv., Inc.,* 87 F.R.D. 353, 345–55 (E.D.La.1980); *Thompson v. Kiekhaefer,* 71 F.R.D. 115, 116 (D.Wis.1976); *Penn Fin. Corp. v. Chelsea Title & Guaranty Co.,* 371 F.Supp. 398 (D.Pa.1974); 6 Charles A.

Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 1444, 312–15. Finally, the Court has jurisdiction over the subject matter of the cross-claim filed by Acadia against American and Commercial pursuant to the requirements of diversity jurisdiction under 28 U.S.C. § 1332.

"advertising injury" is defined by all three policies as follows:

1. "Advertising injury" means injury arising out of one or more of the following offenses:

(a) Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

(b) Oral or written publication of material that violates a person's right of privacy

(c) Misappropriation of advertising ideas or style of doing business; or

(d) Infringement of copyright, title or slogan.

American's CGL Policy, Complaint, Exhibit A at 7; Commercial's Umbrella Policy, Complaint, Exhibit B at 8; Acadia's CGL Policy, DeLorme's Answer and Counterclaim, Exhibit C at 11.

American and Commercial's policies contain several exclusions to coverage, the following which is allegedly relevant here:

This insurance does not apply to:

. . .

b. "Advertising injury" arising out of:

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing or telecasting.

American's CGL Policy, Complaint, Exhibit A at 3–4; Commercial's Umbrella Policy, Complaint, Exhibit B at 3; Acadia's CGL Policy, DeLorme's Answer and Counterclaim (Docket No. 2), Exhibit C at 5. Having set forth the relevant provisions of the insurance policies, the Court will address the issues raised by the parties' arguments.

**B. "Advertising Injury."**

In its counterclaim, Rand McNally alleged trademark infringement under 15 U.S.C. § 1114 and 15 U.S.C. § 1123(a). There has never been an allegation that a duty to defend falls under any provision other than that in the policy providing coverage for suits arising out of "advertising injuries." Hence, the first issue the Court shall address is whether the facts alleged in the counterclaim fall within the definition of "advertising injury" as defined by the insurance policies. DeLorme contends that the general allegations in Rand McNally's counterclaim make out a claim within the coverage of the CGL insurance policy. Not surprisingly, American and Commercial counter, in their motions for summary judgment, that a comparison of the insurance policies and the Rand McNally counterclaim reveals there is no potential for liability within the basic coverage of the policies and, thus, no duty to defend. In its motion for summary judgment, Acadia aligns itself with DeLorme.

 In a diversity case, if the court is required to construe an insurance contract, the court will apply applicable state law. *Griffin v. McCoach*, 313 U.S. 498, 503, 61 S.Ct. 1023, 1025, 85 L.Ed. 1481 (1941). Here, the Court will apply Maine law. A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which it sits. *See Anderson v. Virginia Sur. Co., Inc.*, 985 F.Supp. 182, 186 (D.Me.1998) (citing *Maine Surgical Supply Co. v. Intermedics Orthopedics, Inc.*, 756 F.Supp. 597, 600 (D.Me.1991)). Under Maine choice-of-law principles, "the rights and duties of the parties with respect to an issue in contract are to be determined at the forum level by the local law of the state which, with respect to that particular issue, has the most significant relationship to the transaction and the parties." *Anderson*, 985 F.Supp. at 186. In this case, Maine law is applicable because the insured's risk—the business of DeLorme—is located in Maine. *See Baybutt Constr. Corp. v. Commercial Union Ins. Co.*, 455 A.2d 914, 919 (Me.1983) (applying Maine law because the insured risk was concentrated in Maine), *vacated on other grounds, Peerless Insur. Co. v. Brennon*, 564 A.2d 383 (Me.1989).

" 'Whether an insurer has a duty to defend its insured against a complaint brought by a third party is a question of law.' " *Maine Mut. Fire Ins. Co. v. Gervais*, 715 A.2d 938, 940 (Me.1998) (quoting *Northern Security Ins. Co. v. Dolley*, 669 A.2d 1320, 1322 (Me.1996)). Under Maine law, whether an insurer has a duty to defend is determined under the "comparison test." *See Commercial Union Ins. Co. v. Royal Ins. Co.*, 658 A.2d 1081, 1082 (Me.1995) (citing *State Mutual Ins. Co. v. Bragg*, 589 A.2d 35, 36 (Me.1991)); *Dingwell*, 414 A.2d at 226. "Under that test, a court compares the allegations in the underlying complaint with the provisions of the insurance policy." *Id.* The insured is entitled to a defense if there is any legal or factual basis alleged that could obligate an insurer to defend. *See Commercial Union Ins. Co.*, 658 A.2d at 1082; *Baywood Corp. v. Maine Bonding & Cas. Co.*, 628 A.2d 1029, 1030 (Me.1993).

Accordingly, the insurance companies have a duty to defend DeLorme in the underlying trademark litigation if the Rand McNally counterclaim shows, through its general allegations, a possibility that the liability claim falls within the insurance coverage. *See Gibson v. Farm Family Mut. Ins. Co.*, 673 A.2d 1350, 1352 (Me.1996) (citing *Union Mut. Fire Ins. Co. v. Inhabitants of the Town of Topsham*, 441 A.2d 1012, 1015 (Me.1982)). The allegations in the counterclaim must show only a potential that the facts ultimately proved could come within coverage. *Dingwell*, 414 A.2d at 226. Indeed, under Maine law, "the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage." *Inhabitants of the Town of Topsham*, 441 A.2d at 1015. Pursuant to this standard, "if the general allegations in the complaint could give rise to any set of facts that would establish coverage, then the insurer has a duty to defend." *Gervais*, 715 A.2d at 940 (citing *Dolley*, 669 A.2d at 1322). Furthermore, "the pleading test for determination of the duty to defend is based exclusively on the facts as alleged rather than on the facts as they actually are," *Dingwell*, 414 A.2d at 224 (citing *Lee v. Aetna Cas. & Sur. Co.*, 178 F.2d 750, 752 (2d Cir.1949)), and the policy language is to be "viewed from the perspective of an average person untrained in either the law or the insurance field 'in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured.' " *Union Mut. Fire Ins. Co. v. Commercial Union Ins. Co.*, 521 A.2d 308, 310 (Me.1987) (quoting *Allstate Ins. Co. v. Elwell*, 513 A.2d 269, 271 (Me.1986)). Finally, under Maine law, the insurer must provide a defense if the complaint contains at least one claim that is facially within the policy's coverage. *See Gibson*, 673 A.2d at 1354 (citing *Dingwell*, 414 A.2d at 226–27)).

There is no law in Maine that squarely addresses the issue of whether trademark infringement claims fall within the definition of "advertising injury" as set forth in the standard CGL and Umbrella policies. However, this Court concludes that the Maine Law Court would conclude, in light of the principles of interpretation set forth in its decisions in duty-to-defend cases, that the allegations set forth in the trademark infringement counterclaim fall within the definition of "advertising injury" under the CGL and Umbrella policies.

The first issue is whether the offense was committed in the course of the insured's advertising. Specifically, the question is whether the averments of Rand McNally's counterclaim give rise to the possibility that the trademark infringement was committed in the course of DeLorme's advertising of its product "TRIPMATE." The second issue to resolve is whether the "advertising injury" arose out of the "misappropriation of advertising ideas or style of doing business" or "infringement of copyright, title, or slogan."

■ The counterclaim for trademark infringement under sections 43(a) and 35(a) of the Lanham Act clearly meets the first test of coverage. A trademark is protected under section 43(a) of the Lanham Act, which prohibits any person from using a term, name, symbol or device, or any combination thereof, which is likely to confuse, mistake, or deceive as to the manufacturer, origin, or description of a good or service. *See* 15 U.S.C. § 1125. In addition, a trademark is protected under section 35(a) which prohibits any person from using any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services in a manner that is likely to cause confusion or mistake or to deceive. *See* 15 U.S.C. § 1114. Protection of a trademark serves to "secure the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774, 112 S.Ct. 2753, 2760, 120 L.Ed.2d 615, (1992), *rehearing denied*, 505 U.S. 1244, 113 S.Ct. 20, 120 L.Ed.2d 947 (1992). A Lanham Act claim, thus, requires a party to demonstrate that the infringing mark was used to identify the goods or services to the public in a manner which is likely to confuse the public as to the manufacturer of the goods. *See Gemmy Indus. Corp. v. Alliance Gen. Ins. Co.*, 1998 WL 804698 *3 (N.D.Tex.); *Dogloo, Inc. v. Northern Ins. Co. of New York*, 907 F.Supp. 1383, 1391 (C.D.Cal.1995); *J.A. Brundage Plumbing & Roto–Rooter, Inc. v. Massachusetts Bay Ins., Inc.*, 818 F.Supp. 553, 558 (W.D.N.Y. 1993), *vacated at attorneys' request*, 153 F.R.D. 36 (W.D.N.Y.1994).

■ The term "advertise" is defined as: "To advise, announce, apprise, command, give notice of, inform, make known, publish. To call a matter to the public attention by any means whatsoever. Any oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business. . . ." *Black's Law Dictionary* 54 (6th ed.1990). Furthermore, *Webster's New Collegiate Dictionary* defines the term "advertising" as "the action of calling something to the attention of the public." *Webster's New Collegiate Dictionary* 59 (9th ed.1987). Certainly then, a Lanham Act offense which requires the use of the infringing mark in the identification of the goods and services to the public could give rise to a set of facts that would include advertising activities. *See Gervais*, 715 A.2d at 940. Indeed 15 U.S.C. § 1114(a) specifically and explicitly prohibits the wrongful use of a registered mark in advertising. Accordingly, a claim for trademark infringement under the Lanham Act inherently and necessarily implicates possible advertising activities and a claim for violation of the Act shows the potential that, if the facts are ultimately proved, the offenses were committed in the course of advertising and the claim comes within the policy's coverage.

Such is certainly the case here. In the case at bar, the counterclaim specifically and explicitly alleges that the offense was partly committed in the course of DeLorme's advertising. Rand McNally explicitly set forth allegations that DeLorme's advertising of TRIPMATE contributed to the Lanham Act offense. In its counterclaim, Rand McNally alleged that "DeLorme intentionally chose to bundle . . . in packaging prominently featuring the 'TRIPMATE' trademark . . . to cause consumers to believe . . ."; that "a Best Buy store promotional insert in the January 26, 1997 Sunday editions of many newspapers across the United States—print advertisements that were circulated to millions of consumers—promoted TRIPMATE"; and that "DeLorme has heightened [the] likelihood of confusion by . . . targeting its TRIPMATE electronic cartographic products at the same consumers, marketing such products in the same channels of trade, and advertising them in the same media. Indeed, retail store advertisements, mail order catalogs, and magazines often promote the TRIPMAKER® and TRIP-

MATE electronic cartographic products on the same page...." Rand McNally Counterclaim, Complaint ¶¶ 23, 24, 27, 30.

The allegations in the Rand McNally counterclaim specifically and unequivocally make out a claim that the infringement occurred as a result of DeLorme using the title "TRIPMATE" in its marketing. "Marketing" is "the act or process of selling" goods. *Webster's New Collegiate Dictionary*, 728 (9th ed.1983). Advertising is a commonly used method of marketing. Where a claim alleges that the marketing of a knock-off product results in harm, it would be artificial to deny coverage by constructing a distinction between injuries arising from the *marketing* of infringing goods and injuries arising from the display or *advertising* of the goods. Furthermore, the counterclaim alleges that actual confusion was caused by DeLorme's advertising activities. Thus, the counterclaim, viewed from the perspective of an average person untrained in either the law or the insurance field, as required under Maine law, *see Union Mut. Fire Ins. Co.*, 521 A.2d at 310, alleges that the infringement occurred in the course of DeLorme's advertising activities. The majority of courts that have considered whether a trademark infringement claim arose out of an "advertising injury" under the same form policy agree. *See Gemmy Indus. Corp.*, 1998 WL 804698 *3 (holding that "[i]t is impossible to allege a Lanham Act claim without the infringing mark being used to identify the goods or services to the public."); *Dogloo, Inc.*, 907 F.Supp. at 1391 (in finding that a claim for trademark infringement constituted an "advertising injury," reasoning that "in contrast to a claim for patent infringement—which is limited to the making, using, or selling of another's product—section 43(a) of the Lanham Act provides a remedy for a false designation of origin, or any false description or representation," a claim which "necessarily involves advertising"); *P.J. Noyes Co. v. American Motorists Ins. Co.*, 855 F.Supp. 492, 495 (D.N.H.1994) (holding that "although the underlying action is one for trademark infringement, the infringement occurred as a result of the [underlying defendant's] use of the trademark in their advertising"); *J.A. Brundage Plumbing & Roto Rooter, Inc.*, 818 F.Supp. at 558; *B.H. Smith, Inc. v. Zurich Ins. Co.*, 285 Ill.App.3d 536, 221 Ill.Dec. 700, 676 N.E.2d 221, 223 (1996).

■ The next issue to consider is whether the averments of the trademark infringement counterclaim show the potential for liability arising out of the "misappropriation of advertising ideas or style of doing business" or an "infringement of a copyright, title, or slogan." American and Commercial do not dispute that the concept of trade dress protected under the Lanham Act is a "style of doing business," and most courts that have addressed the same issue under the same form policy have concluded that it is. *See Industrial Molding Corp. v. American Mfrs. Mut. Ins. Co.*, 17 F.Supp.2d 633, 637 (N.D.Tex. 1998), *vacated upon settlement at attorneys' request*, 22 F.Supp.2d 569 (N.D.Tex. 1998); *Applied Bolting Tech. Prods., Inc. v. United States Fidelity & Guar. Co.*, 942 F.Supp. 1029, 1034 (E.D.Pa.1996), *aff'd*, 118 F.3d 1574 (3d Cir.1997); *American Econ. Ins. Co. v. Reboans, Inc.*, 900 F.Supp. 1246, 1254 (N.D.Cal.1994); *Union Ins. Co. v. Knife Co., Inc.*, 897 F.Supp. 1213, 1216 (W.D.Ark.1995); *Poof Toy Products, Inc. v. United States Fidelity and Guar. Co.*, 891 F.Supp. 1228, 1232 (E.D.Mich.1995), *rejected by Advance Watch Co. Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795 (6th Cir.1996); *Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 878 F.Supp. 1034, 1038–39 (E.D.Mich. 1995), *reversed*, 99 F.3d 795 (6th Cir.1996); *St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Sys., Inc.*, 824 F.Supp. 583, 585 (E.D.Va.1993), *aff'd*, 21 F.3d 424, 1994 WL 118029 (4th Cir.1994); *J.A. Brundage Plumbing & Roto–Rooter, Inc.*, 818 F.Supp. at 557. As a district court has already explained,

in the ordinary sense of these terms, misappropriation of an "advertising idea" would mean the wrongful taking of the manner by which another advertises its goods or services. This would include the misuse of another's trademark or trade name. Similarly, one's mark and name is an integral part of an entity's "style of doing business." Such misappropriation of "style of doing business" would include trademark, trade name or service mark infringement.

*Union Ins. Co.*, 897 F.Supp. at 1216 (quoting *J.A. Brundage Plumbing & Roto-Rooter, Inc.*, 818 F.Supp. at 557). Accordingly, a trademark infringement claim is included in the phrase "style of doing business." The issue remaining to be resolved, and the one hotly contested by the insurers, is whether the term "misappropriation" is broad enough to include a claim for trademark infringement.

■■■ American and Commercial argue that trademark infringement is *not* an "advertising injury" because the word "misappropriation" is not broad enough to encompass a claim of trademark infringement. They urge the Court to follow the rationale set forth by the United States Court of Appeals for the Sixth Circuit in *Advance Watch v. Kemper National Insurance Co.*, 99 F.3d 795 (6th Cir.1996). In *Advance Watch*, the court held that the term "misappropriation" as used in a CGL insurance policy did not refer to the taking of interests such as those protected by trademark law. 99 F.3d at 802. That court reasoned that "misappropriation" was well defined in the common law pursuant to the Supreme Court's decision in *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), and did not include trademark infringement. In reversing the district court, the Court of Appeals for the Sixth Circuit reasoned that,

the district court's broad reading of "misappropriation of advertising ideas or style of business" to include a reference to trademark or trade dress infringe-

ment would therefore expand the sense of "advertising injury" to include non-verbal conduct—a result difficult to rationalize in light of the ordinary meaning of "advertising."

*Advance Watch*, 99 F.3d at 803. The Court declines to adopt this reasoning. The decision in *Advance Watch* is the great exception to the trend under the law and, in light of the principles established under Maine law in duty to defend cases, the Court does not believe that the Maine Law Court would follow that rationale.

To adopt the reasoning set forth in *Advance Watch* would be to thwart the principles of litigation insurance policy construction developed under Maine law. That court's conclusion was based on an historical distinction between the tort of misappropriation and trademark infringement. Under Maine law, however, it is well established that the terms of insurance contracts must be given their plain, ordinary, and generally accepted meanings, and that the contract language is to be viewed from the perspective of an average person, untrained in either the law or the insurance field, "in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Union Mut. Fire Ins. Co.*, 521 A.2d at 310 (internal quotations omitted). American and Commercial's approach, requiring the Court to adopt the common law definition of "misappropriation" as defined by the Supreme Court in *International News Service* rather than its plain and commonly accepted meaning, would violate this rule.

■■■ Whether language in a contract of insurance is ambiguous is a question of law. *See Peerless Ins. Co.*, 564 A.2d at 384. Furthermore, the meaning of "unambiguous language" in an insurance contract is a question of law. *See Cambridge Mut. Fire Ins. Co. v. Perry*, 692 A.2d 1388, 1390 (Me.1997) (citing *Globe Indem. Co. v. Jordan*, 634 A.2d 1279, 1282 (Me.1993)). "The language of a contract of insurance is ambiguous if it is reasonably susceptible of

different interpretations." *Peerless*, 564 A.2d at 383 (internal quotations omitted). The ordinary meaning of "misappropriate" is not ambiguous or unclear. It means "[t]o appropriate wrongly;" that is to wrongfully "take or make use of without authority or right." *Webster's New Collegiate Dictionary*, 98, 758 (9th ed.1987). The Court must interpret unambiguous language in a contract according to its plain and commonly accepted meaning. *See Maine Drilling & Blasting, Inc. v. Insurance Co. of North Am.*, 665 A.2d 671 674–75 (Me.1995) (citing *Brackett v. Middlesex Ins. Co.*, 486 A.2d 1188, 1190 (Me. 1985)). Because the term "misappropriate" is unambiguous, the Court must adopt the plain and commonly accepted meaning, rather than the common law definition purported to apply by the Court of Appeals for the Sixth Circuit.

█ Rand McNally alleged violations under sections 43(a) and 35(a) of the Lanham Act. A claim under section 43(a) alleges that a person has wrongfully used a term, name, symbol, device, or any combination thereof, which confuses or deceives as to the origin of the trademark. *See* 15 U.S.C. § 1125(a). In addition, a claim under section 35(a) avers that a person wrongfully used a reproduction, counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which use is likely to cause confusion. *See* 15 U.S.C. § 1114(a). These claims were clearly alleged in Rand McNally's counterclaim. In sum, these claims accuse DeLorme of wrongfully taking Rand McNally's style of doing business and using it as its own by using a mark for its product that was so similar to Rand McNally's mark for a similar product that confusion among consumers would be caused and DeLorme would benefit from Rand McNally's strong reputation. Under the ordinary meaning of misappropriation, Rand McNally's trademark infringement counterclaim falls under its definition.

Other courts interpreting the same policy language have concluded that the misuse of another's trademark constitutes "misappropriation" of a "style of doing business." *See Gemmy Indus. Co.*, 1998 WL 804698 at *4; *Industrial Molding*, 17 F.Supp.2d at 639; *Dogloo, Inc.*, 907 F.Supp. at 1389–90; *Union Ins. Co.*, 897 F.Supp. at 1216–17; *Poof Toy Products*, 891 F.Supp. at 1232–33; *Sentex Sys., Inc. v. Hartford Accident & Indem. Co.*, 882 F.Supp. 930, 941–44 (C.D.Cal.1995), *aff'd*, 93 F.3d 578 (9th Cir.1996); *Advance Watch*, 878 F.Supp. at 1041–42; *P.J. Noyes Co.*, 855 F.Supp. at 494–95; *J.A. Brundage Plumbing & Roto–Rooter, Inc.*, 818 F.Supp. at 557–58; *B.H. Smith, Inc.*, 221 Ill.Dec. 700, 676 N.E.2d at 224; *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 50 Cal.App.4th 548, 59 Cal.Rptr.2d 36, 46–48 (1996). The Court concludes that trademark infringement constitutes a "misappropriation" of a "style of doing business" under the CGL policy. Therefore, the Court concludes that under Maine law, the enumerated definition of "advertising injury," "misappropriation" of "style of doing business," includes Rand McNally's counterclaim for trademark infringement.

█ This Court also concludes, as other courts have done, that an action for trademark infringement can be described as an action for "infringement of a copyright, title, or slogan" as those terms are used in the policy. *See American Econ. Ins. Co.*, 900 F.Supp. at 1253–54; *Union Ins. Co.*, 897 F.Supp. at 1217; *Poof Toy Products*, 891 F.Supp. at 1234; *P.J. Noyes Co.*, 855 F.Supp. at 494–95; *Sentex Sys., Inc.*, 882 F.Supp. at 944; *J.A. Brundage Plumbing & Roto–Rooter, Inc.*, 818 F.Supp. at 558–59; *First State Ins. Co. v. Alpha Delta Phi Fraternity*, 39 U.S.P.Q.2d 1905, 1913, 1995 WL 901452 (Ill.App. 1st Dist.1995). Under the Lanham Act, a trademark is defined as "any word, name, symbol or device or any combination thereof, adopted by a manufacturer to identify his goods and distinguish them

from those manufactured and sold by others." 15 U.S.C. § 1127. American and Commercial claim that, because "trademark infringement" is not listed in section (d) of the definition section of "advertising injury," it is not an "advertising injury" covered by that section of the policy. The insurers rest this contention on the interpretation of section (d) of the policy as a list of offenses that will give rise to liability for damages covered by the policy. Accordingly, they argue that if the offense of trademark infringement were covered, it would have been included in this list.

This argument is untenable. There is no such separate offense entitled "infringement of . . . title or slogan" thus supporting the interpretation that this section is a list of separate offenses from which "trademark infringement" was excluded. Furthermore, *Black's Law Dictionary* defines the term "title" as, "a mark, style or designation, a distinctive appellation; the name by which anything is know." *Black's Law Dictionary* 1485 (6th ed.1990). According to this definition, a "title" may be a mark and, thus, be protected as a trademark. Other courts have so concluded. *See First State Ins. Co.*, 39 U.S.P.Q.2d at 1912–13. This section may, hence, be read as covering actions for the infringement of a trademark. If American and Commercial wanted to limit their exposure to suits arising under the common law tort of misappropriation, it would have been a simple matter to do so. *See Vigna v. Allstate Insur. Co.*, 686 A.2d 598, 601 (Me.1996). Furthermore, " 'the intention of the parties must be gathered, not from what the parties said or did or thought they intended, but from the contract itself.' " *Id.* (quoting *Hartford Fire Insur. Co. v. Merrimack Mut. Fire Insur. Co.*, 457 A.2d 410, 414 (Me.1983).) Therefore, a plain reading of section (d), in light of the foregoing principles, leads to the conclusion that trademark infringement claims are included, rather than excluded, in the policy's coverage.

## C. Suit for Damages.

■ Having determined that Rand McNally's trademark infringement claim constitutes an "advertising injury" that is covered by the policies issued by American, Commercial, and Acadia, the Court must now address American and Commercial's contention that there is no duty to defend DeLorme because the policies obligate the insurers to defend only suits seeking money damages and the Rand McNally counterclaim seeks only equitable relief. The Court rejects American and Commercial's contention and concludes that the Rand McNally counterclaim for trademark infringement was a " 'suit' seeking damages" under the insurance agreements.

Under the section providing coverage for "personal" and "advertising injuries," the insuring agreements provide that,

> [w]e will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages . . . .

The word "damages" is not defined. The Counterclaim prays for a permanent injunction, an equitable accounting by DeLorme of all profits, gains, and advantages obtained by DeLorme from its sale of TRIPMATE pursuant to 15 U.S.C. § 1117, costs and attorney fees, and "other and further relief as the Court deems just and proper." *See* Counterclaim at Prayer for Relief.

American and Commercial argue that the term "damages" as used in the liability policies does not encompass cases where only equitable relief is sought and where the insured is not asked to compensate a third party for loss sustained by that party. The crux of this argument is that a request for an equitable accounting of profits and other relief provided under 15 U.S.C. § 1117 is not a request for "damages" as defined under the policies. The Lanham Act entitles a plaintiff to recover a defendant's profits. See 15 U.S.C.

§ 1117. Thus, DeLorme argues that an accounting for profits, as prayed for by Rand McNally in its counterclaim, is "damages" covered under the policies because, under the Lanham Act, a defendant's profits are awarded as a surrogate for damages. The Court agrees with DeLorme.

American and Commercial first reason that an accounting for profits is not a request for damages under the policies because a request for an accounting of lost profits, even if it may lead to a request for damages eventually, is not a *current* request for damages. The insurers rely on *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16, 16–17 (Me.1990), wherein an insured claimed that its insurer had a duty to defend in an administrative proceeding brought against it by the Maine Department of Environmental Protection (DEP). The court in that case reasoned that the administrative proceeding was not a suit for damages because the DEP could only compel a clean-up and no third parties had made any claim for damages for which the insured may be liable. *See id.* at 20. The *Patrons Oxford* case is inapposite to the one at bar. The present case does not involve only an administrative order. In the present case, a third party has made a request for an accounting of lost profits under the Lanham Act.

Furthermore, a request for an accounting of lost profits under the Lanham Act is a request for damages. In *Limelight Productions, Inc. v. Limelite Studios*, 60 F.3d 767, 769 (11th Cir.1995), the Court of Appeals stated that it "recognizes ill-gotten profits as merely another form of damages that the statute permits to be presumed because of the proof unavailability in these actions." The Court of Appeals for the Eleventh Circuit concluded that, "when [the insurers] issued these policies they knew of the Lanham Act, were on notice plaintiffs could recover ill-gotten profits, and must be held to have intended to cover these damages because they did not exclude them." *Id.* The Maine Law Court has construed the promise to pay "dam-

ages" in standard insurance policies to mean "a promise to pay amounts that might be awarded against an insured to 'recompense' a third party for damage to the third party's property for which the insured is held legally liable." *Gibson,* 673 A.2d at 1353. Applying Maine law to construe the policy, we interpret the word "damages" broadly in favor of the insured because American, Commercial, and Acadia wrote the policies, selected that term, and chose not to define or restrict the term. Hence, a claim for an accounting for lost profits under the Lanham Act is a claim for "damages."

In addition, compensation for loss is one of the rationales for an accounting of profits under the Lanham Act. An award of both damages and lost profits is prohibited where it would result in over-compensation. Double recovery would result where the parties directly compete and the plaintiff seeks to recover both damages for losses attributable to diverted sales, and the profits earned on sales made by the defendant. *See International Communication Materials, Inc. v. Employer's Insur. of Wausau,* 1996 WL 1044552, * (W.D.Pa.) (citing *Big O' Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,* 408 F.Supp. 1219, 1241 (D.C.Colo.1976), *modified,* 561 F.2d 1365 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978)). Here, Rand McNally alleged, and DeLorme did not deny, that the companies are direct competitors of each other. Rand McNally Counterclaim, Complaint, Exhibit C, ¶ 2. Furthermore, Rand McNally did not request compensation for lost sales in its prayer for relief. Thus, the counterclaim shows, through its allegations, a possibility that the accounting for lost profits would, in fact, equal compensation for DeLorme's lost sales. Thus, according to the allegations in the counterclaim, recovery under the Lanham Act may result in an award to recompense Rand McNally for the damages it incurred as a result of DeLorme marketing TRIP-MATE. "If the allegations in the underly-

ing tort action are within the risk insured against and there is any potential basis for recovery, the insurer must defend the insured regardless of the actual facts on which the insured's ultimate liability may be based." *Id.* Accordingly, the Court concludes that the underlying suit requesting an accounting for lost profits is a suit for "damages" under the insuring agreements.

The Court's conclusion is supported by a second ground. In its counterclaim, Rand McNally requested "other and further relief as the Court deems just and proper." Rand McNally Counterclaim, Prayer for Relief at 31–32. Furthermore, the counterclaim states causes of action under sections 35(a) and 43(a) of the Lanham Act for both of which compensatory damages are available. *See* 15 U.S.C. § 1117. Had the trademark infringement claims gone to trial and Rand McNally prevailed, the Court still could have awarded Rand McNally money damages if Rand McNally succeeded in proving that it was entitled to equitable relief. *See BH Smith, Inc.,* 221 Ill.Dec. 700, 676 N.E.2d at 224. Thus, American and Continental's argument that Rand McNally's prayer for equitable relief precluded DeLorme from having to defend DeLorme in the underlying trademark infringement action is misguided.

### D. The Publishing Exclusion.

■ The Court has concluded that Rand McNally's trade infringement counterclaim is an "advertising injury" and a suit for damages under the CGL and Umbrella policies issued by American, Commercial, and Acadia. Notwithstanding this conclusion, the Court must next consider whether the policy coverage does not apply to any "advertising injuries" committed by DeLorme. Specifically, the question is whether the so-called "publishing exclusion" contained in all three policies precludes a duty to defend on the part of the insurers. As mentioned, the "publishing exclusion" provides that,

This insurance does not apply to:

. . . .

b. "Advertising injury" arising out of:

. . . .

(4) An offense committed by an insured whose business is advertising, broadcasting, publishing, or telecasting.

American's CGL Policy, Complaint, Exhibit A at 4; Commercial's Umbrella Policy, Complaint, Exhibit B at 3; Acadia's CGL Policy, DeLorme's Answer and Crossclaim, Exhibit C at 5. American and Commercial move for summary judgment on the ground that the "publishing exclusion" precludes their duty to defend DeLorme against the Rand McNally counterclaim. DeLorme moves for summary judgment on the ground that the "publishing exclusion" is not applicable in this case. Again, Acadia sides with DeLorme.

The main contentions of the parties are as follows: American and Commercial contend that the language of the exclusion is unambiguous and excludes coverage for companies in the publishing business. Consequently, they assert that DeLorme is "in the business of publishing" and, thus, is not covered for suits arising from the "advertising injuries" caused by DeLorme. DeLorme and Acadia counter that the Court should find a distinction between an insured who is "in the publishing business" and an insured "whose business is publishing." According to this distinction, DeLorme is covered under the policy for suits arising out of the "advertising injuries" it causes because although DeLorme is *in* the business of publishing, publishing is not its *sole* business and thus, its business is not publishing as required by the language of the exclusion.

As previously noted on another substantive point of law, *supra* at IIB, whether a given insurance contract is ambiguous is a question of law for the court. *See Maine Drilling & Blasting, Inc.,* 665 A.2d at 674. The language of a contract of insurance is ambiguous only if it is reasonably suscepti-

ble of different interpretations. *See id;* *Peerless Insur. Co.*, 564 A.2d at 384 (citing *Brackett*, 486 A.2d at 1189). In addition, "[a] policy is ambiguous if an ordinary person in the shoes of the insured would not understand that the policy did not cover claims such as those brought . . . ." *Peerless Insur. Co.*, 564 A.2d at 384 (citing *Allstate Ins. Co.*, 513 A.2d at 271). "The court must interpret unambiguous language in a contract according to its plain and commonly accepted meaning." *Brackett*, 486 A.2d at 1190. As previously stated, unambiguous language should be viewed from the standpoint of the average ordinary person who is untrained in either the law or the insurance field. *See Union Mut. Fire Insur.*, 521 A.2d at 310 (quoting *Allstate Insur. Co.*, 513 A.2d at 271) (internal quotations omitted); *see also Limberis v. Aetna Cas. and Sur. Co.*, 263 A.2d 83, 86 (Me.1970) (the exclusionary clause must be given the meaning which a person of ordinary intelligence would attach to it). However, if the Court finds that the language of the exclusion is ambiguous, it must invoke the firmly established rule that it "will construe conditions and exceptions of the insurance contract, inserted therein in an attempt to limit the coverage . . ., strictly against the insurer and liberally in favor of the insured . . . ." *See Patrons-Oxford*, 426 A.2d at 891. "The rule requiring a strict construction against the insurer and a liberal construction in favor of the insured 'is not applicable unless there is ambiguity in the terms of the policy. The terms of the policy are to be taken and understood in their ordinary sense.' " *Union Mut. Fire Insur.*, 521 A.2d at 311.

The Court finds no ambiguity in the pertinent language of the exclusion. Thus, the unambiguous language must be interpreted according to its plain and commonly accepted meaning. *See Peerless Insur. Co.*, 564 A.2d at 384 (citing *Brackett*, 486 A.2d at 1189); *Limberis*, 263 A.2d at 86. The phrase "insured whose business is . . . publishing" clearly applies to insureds whose primary, essential, chief or principal business is publishing. As discussed below, it is uncontested that DeLorme's "principal" business is publishing. Therefore, interpreted according to its plain and generally accepted meaning, the exclusion from the coverage operates to deny coverage for DeLorme's defense costs for suits arising out of "advertising injuries."

The Court rejects DeLorme's attempt to convince the Court that the language of the exclusion is ambiguous and should, as the canons of insurance contract interpretation provide, be interpreted in favor of coverage. DeLorme contends that it is unclear from a plain reading of the exclusion whether it applies to businesses whose *sole* business is one of the four areas or whether the exclusion encompasses insureds whose business, *only in part*, is one of the four areas. Clearly, the exclusion does not apply to insureds whose sole business is one of the four areas. This flies in the face of common sense. Most, if not all, businesses are engaged in multiple areas of business even if they primarily practice in one area. For instance, a company that primarily manufactures goods likely advertises those goods and perhaps even publishes a catalog featuring those goods. A person of ordinary intelligence would still accurately describe this company as a company that is in the business of manufacturing. It would belie logic to interpret the exclusion in a manner that rendered it wholly inapplicable because no insureds would qualify.

Additionally, the language of the exclusion makes it clear that it does not apply to insureds who are "in the business of . . . publishing" only in part. The phrasing "insureds whose business is . . ." clearly contemplates that the insured is more than just, in part, engaged in one of the four listed activities. An ordinary person would not reasonably conclude that the exclusion applies if one of a company's ancillary activities is in one of the four listed areas. For example, the fictitious manufacturing company described above

would not be excluded from coverage for suits arising from "advertising injuries" simply because, in addition to chiefly manufacturing goods, it advertises its goods and publishes a catalog. By not qualifying the phrase "in the business" to include even "in the business in part," the parties did not broaden the reach of the exclusion to include insureds whose ancillary activities include one of the four listed areas. Hence, in this context, to be "in the business" of one of the four listed areas plainly means to be more than merely engaged in part and clearly means to be at least primarily engaged in that activity. Furthermore, as required under Maine law, this interpretation is more in favor of the existence of coverage and, thus, liberally construed in favor of insureds.

■ A policy is ambiguous only if it is susceptible to alternative meanings by an ordinary person. "This is not to say, however, that every time an insurer and an insured disagree on the meaning of the contract, the insured's interpretation must prevail. Mere hope of coverage by the insured, or inability of the insured to understand the policy, does not render the contract ambiguous." *Colford v. Chubb Life Insur. Co. of Am.*, 687 A.2d 609, 614 (Me.1996). Here, the language of the exclusion is reasonably and fairly susceptible to only one meaning. An ordinary person would reasonably understand that the exclusion applies to insureds who are primarily, rather than solely or only partially, engaged in one of the four listed areas of business and thereby excluded from the CGL policy's coverage for suits arising from "advertising injuries." It is possible that a question of fact may arise under this provision as to whether the insured is, in fact, *primarily* in the business of one of the four listed areas rather than involved merely in an ancillary manner. This, however, does not render the language obscure and the factual basis for the application of the plain meaning of the language can be determined from the evidence by the fact finder.

■ Here, there is no question of fact as to whether DeLorme is engaged primarily in the publishing business. Applying the exclusion to DeLorme it is clear that coverage for defense costs in suits arising out of "advertising injuries" are excluded from the policy's coverage. DeLorme explicitly avers that it is "principally engaged in the design, printing, and sale of atlases and maps, in the development and sale of computer mapping software and databases, and recently in the design and sale of hardware that can be used in conjunction with its mapping software." Affidavit of Vice President, Contracts and Legal, of DeLorme Publishing Co., Inc. ¶ 1. DeLorme also states, through its Vice President's affidavit, that computer programs and databases are "published" while hardware is "marketed." *Id.* ¶ 5. Despite the averments contained in the affidavit submitted by DeLorme that the design, printing, and sale of atlases and maps are "published," DeLorme falls back from this position in its papers and characterizes these activities as *arguably* publishing. *See* DeLorme's Motion for Summary Judgment at 10.

The Court finds, however, that the principal activities of DeLorme (the design and printing of atlases and maps and the development of computer mapping software and databases) are publishing. The word "publishing" must be interpreted according to its plain and generally accepted meaning. *See Peerless Insur. Co.*, 564 A.2d at 384; *Brackett*, 486 A.2d at 1190; *Limberis*, 263 A.2d at 86. The word "publication" is defined as "[t]he act of publishing a book, periodical, map, piece of music, engraving, or the like." *Random House Unabridged Dictionary* 1162 (2d ed.1966). Furthermore "publishing" is defined as "the business or profession of the commercial production and issuance of literature, information, musical scores or sometimes recordings." *Webster's New Collegiate Dictionary* 952, (9th ed.1983). Accordingly, by DeLorme's own admission, it is a company "principally engaged" in the busi-

ness of publishing. This description of DeLorme is further supported by the fact that the company is incorporated as DeLorme Publishing Company, Inc. The Court concludes, therefore, that an ordinary person, in reading the policies, would have understood that there was no coverage under the CGL and Umbrella policies for DeLorme's defense against the suits arising from "advertising injuries" and, thus, no coverage for the underlying trademark infringement counterclaim.

The foregoing interpretation is supported by the purpose of the exclusion. The evident purpose is to avoid the significantly greater risk of the misappropriation and infringement subsets of "advertising injury" liability incurred by insurers who are in the advertising business, and with respect to the defamation and privacy subsets of advertising injury, incurred by insureds who are in the publishing business. This purpose is served by interpreting the provision, as the Court has done here, to apply only to those businesses who are primarily or chiefly involved in one of the four listed activities.

 The additional arguments presented by DeLorme and Acadia are also rejected by the Court. DeLorme contends that even if its activities are "publishing" as that term is used in its CGL and Umbrella policies, the exclusion does not apply in this case because the particular "advertising injury" did not arise out of its publishing activities because TRIPMATE is a piece of hardware and is manufactured, rather than published. The exclusion's language clearly does not intend to differentiate between "advertising injuries" that arise out of publishing activities and those that do not. The language provides that, under the policy, there is no insurance "for an offense *committed by an insured* whose. . . ." The language of the exclusion,

therefore, qualifies which *insureds* meet its criteria rather than which "advertising injuries" do so. The exclusion clearly does not differentiate between contexts in which "advertising injuries" arise. Hence, the Court rejects DeLorme's contention.[4]

 Acadia contends that the publishing exclusion cannot be interpreted to negate "advertising injury" coverage in its entirety for an insured because such an interpretation would render the "first publication" exclusion contained in the policy superfluous and, thus, violate Maine principles of insurance contract construction. The "first publication" exclusion provides that the insurance does not apply to an "advertising injury" that arises out of oral or written publication of material whose first publication took place before the beginning of the policy period. American's CGL Policy, Complaint, Exhibit A at 3–4; Commercial's Umbrella Policy, Complaint, Exhibit B at 3; Acadia's CGL Policy, DeLorme's Answer and Counterclaim, Exhibit C at 5. It is true that, under Maine law, "[a]ll parts and clauses must be considered together that it may be seen if and how far one clause is explained, modified, limited or controlled by the others." *Peerless Insur. Co.*, 564 A.2d at 385. However, the Court disagrees that the "first publication" exclusion renders the Court's interpretation of the publishing exclusion unreasonable or unfair. Under the policy, an insured is not excluded from coverage for "advertising injuries" pursuant to the publishing exclusion when its principal business is not one of the four criterion. This insured is still potentially at risk of not being covered under the policy for "advertising injuries" that are first published before the policy period begins. The Court's interpretation, thus, does not render either of the exclusions superfluous. Accordingly, Acadia's contention is rejected.

---

4. The Court notes its disagreement with DeLorme's characterization of the Rand McNally claim. As American and Commercial point out, the underlying counterclaim against DeLorme alleged that the infringement was the result of the use of the mark "TRIPMATE" on a GPS receiver and mapping software called STEET ATLAS USA®. DeLorme admits that software is published. Thus, the trademark infringement claim did, in fact, arise out of DeLorme's publishing activities.

To summarize, the Court finds that the Rand McNally counterclaim for trademark infringement falls under "advertising injury" and is a suit for damages under the CGL and Umbrella policies. Furthermore, the language of the "publishing exclusion" is not ambiguous because it is not susceptible to more than one reasonable and fair interpretation. The Court interprets the language of the exclusion to exclude coverage for defense costs in suits arising out of "advertising injuries" for insureds who are chiefly, essentially, or principally in the business of advertising, broadcasting, publishing, or telecasting. Because it is uncontested that DeLorme is "principally engaged" in the business of publishing, coverage for its defense costs in the trademark infringement claim that arose from an "advertising injury" is excluded under the policy.

Therefore, there is no duty to defend under the CGL policies issued by American and Acadia and, likewise, there is no duty to defend under the Umbrella policy issued by Commercial. Because no duty to defend exists under policies, DeLorme may not recover defense costs from American, Commercial and Acadia for the amount of the $25,000 deductible under the MPL policy. Furthermore, Acadia may not recover reimbursement from American and Commercial for the costs it expended for the underlying trademark infringement suit under its MPL policy.

### III. CONCLUSION

The Court **ORDERS** that American and Commercial's motion for summary judgment be, and it is hereby, **GRANTED.** The Court further **ORDERS** that DeLorme's motion for summary judgment be, and it is hereby, **DENIED.** In addition, the Court **ORDERS** that Acadia's motion for summary judgment be, and it is hereby, **DENIED.**