**NEW LIFE BROKERAGE SERVICES, INC. and New Life Holding Company, Inc., Plaintiffs,**

v.

**CAL–SURANCE ASSOCIATES, INC., Defendant.**

**No. CIV. 01–172–B–C.**

United States District Court, D. Maine.

Sept. 16, 2002.

Todd S. Holbrook, Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for Plaintiffs.

John B. Lucy, Richardson, Whitman, Large & Badger, Bangor, ME, John S. Whitman, Richardson, Whitman, Large & Badger, Portland, ME, for Defendant.

James M. Bowie, Assistant Attorney General, Augusta, ME, for Movant.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

GENE CARTER, District Judge.

The United States Magistrate Judge having filed with the Court on June 26, 2002, with copies to counsel, her Recommended Decision on Defendant's Motion for Summary Judgment on Proximate Cause (Docket No. 71); and Plaintiffs having filed their objection thereto on July 15, 2002, (Docket No. 73), to which objection Defendant filed its response on July 25, 2002 (Docket No. 75); and this Court having reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; and this Court having made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision, and concurring with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision, it is **ORDERED** as follows:

(1) Plaintiffs' objection is hereby **DENIED**;

(2) The Recommended Decision of the Magistrate Judge is hereby **AFFIRMED**;

(3) Summary judgment is hereby **GRANTED** on all counts in favor of Cal–Surance Associates, Inc.

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PROXIMATE CAUSE

KRAVCHUK, United States Magistrate Judge.

Plaintiffs brought this action after its insurance claim was not covered under the policy the insurance broker, defendant Cal–Surance Associates, Inc. ("CSA"), recommended and procured for plaintiffs. New Life alleges that by failing to design and obtain appropriate coverage for New Life's securities business, CSA committed breach of contract (Count I), breach of fiduciary duty (Count II), professional negligence (Count III), negligent misrepresentation (Count IV), and fraud (Count V). CSA filed the present Motion for Summary Judgment on all counts on the ground that there are no issues of material fact regarding the issue of proximate cause. (Docket No. 36.)[1] I recommend that the Court **GRANT** summary judgment on all counts. In a related matter, I **DENY** CSA's Motion to Strike Insurance Policies Belatedly Disclosed by Plaintiffs (Docket No. 57). The motion pertains to some twenty policies that New Life disclosed after the close of discovery, but New Life has only relied upon five policies in its opposition to the summary judgment motion. I have considered the five relevant polices in reaching my conclusion that CSA is entitled to summary judgment on this record.

### Summary Judgment Standard

Summary Judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter at law." Fed.R.Civ.P. 56(c). An issue is "genuine" if, based on the record evidence, a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" when it has the "potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir.1993). The court reviews the summary judgment record in the light most favorable to the nonmoving party. *Levy v. FDIC*, 7 F.3d 1054, 1056 (1st Cir.1993). The moving party must demonstrate an absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where this preliminary showing has been met and where the nonmoving party bears the burden of proof at trial, the nonmoving party must go beyond the pleadings to establish that there are "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will have the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

### Facts

Plaintiff New Life Brokerage Services, Inc. ("New Life") is a Maine securities broker-dealer firm with over twenty registered representatives throughout the state working as independent contractors. (Def.'s Statement of Material Facts

---

1. There are three other motions pending before the court that are rendered moot if the court adopts this recommended decision and therefore I further recommend that the court **DISMISS** these motions as moot. New Life has filed a motion for partial summary judgment on the issue of liability on Counts II, III, and IV of the complaint (Docket No. 33). CSA has filed a motion for summary judgment on all counts on the issue of liability (Docket No. 39). CSA has also filed a Motion to Exclude the testimony of Plaintiff's Expert, Elliott Rothman (Docket No. 38).

("DSMF") ¶ 1.) Defendant CSA is an insurance agent/broker in California. (*Id.* ¶ 2.) In 1993, New Life contacted CSA to obtain Errors and Omissions ("E & O") liability insurance. (*Id.* ¶ 4.) After receiving New Life's application, CSA obtained an E & O policy for New Life and its registered representatives. (*Id.* ¶ 5.) CSA procured E & O policies for New Life every subsequent year through 2000, from three insurance companies: The Home Insurance, Zurich–American, and Pacific Employers. (*Id.*) Each of these E & O policies were "claims-made" policies, meaning they covered claims which were first made during the policy term. (*Id.* ¶ 6.) They all provided liability insurance limits of one million dollars per claim and two million dollars aggregate. (*Id.*)

From 1996 to 1997, one of New Life's registered representatives sold approximately $1.3 million worth of securities that were neither registered with the State of Maine nor approved for sale by New Life. (*Id.* ¶ 7.) When a registered representative sells unapproved securities without the knowledge of his broker-dealer firm, he has committed what is known in the securities business as "selling away." (*Id.* ¶ 8.) A registered representative is exposed to civil and criminal penalties for "selling away." (*Id.*) A broker-dealer whose registered representative has engaged in "selling away" may be subject to civil and criminal penalties for failing to supervise the registered representative. (*Id.*) Further, both the registered representative and the broker-dealer may be sued by the customers who purchased the securities. (*Id.*) As of January 2, 2002, none of New Life's customers have sued or asserted a claim against New Life or the representative in an effort to recover damages arising from their purchase of the unapproved securities. (*Id.* ¶ 9.)

On November 20, 1997, the Securities Division of the State of Maine Bureau of Banking ("the Securities Division") sent a letter to New Life stating that the representative had sold unregistered securities. (*Id.* ¶ 10.) A subsequent investigation conducted by the Securities Division revealed the degree of the representative's "selling away." (*Id.* ¶ 11.) The Securities Division took the position that New Life's supervision of the representative had been inadequate, thus the Securities Division sought sanctions against New Life. (*Id.* ¶ 12.) The sanctions included the revocation of New Life's broker-dealer license, unless New Life would repurchase a substantial quantity of the unregistered securities and establish effective supervisory procedures. (*Id.*) During 1998 and 1999, New Life and the Securities Division engaged in extensive negotiations regarding the dollar amount New Life should pay in repurchasing the unapproved securities. (*Id.*) On September 21, 1998, New Life contacted its current insurer, Zurich– American, to put the insurer on notice of the representative's "selling away" and the Securities Division's investigation. (*Id.* ¶ 13.) The following month, Zurich–American advised New Life that its E & O policy did not provide coverage for "selling away." (*Id.* ¶ 14.) In November, 1998, New Life contacted CSA inquiring as to whether it could obtain an E & O policy which would include coverage for "selling away." (*Id.* ¶ 15.) Up to this point, all of the policies CSA procured for New Life specifically excluded coverage for claims arising from "selling away." (*Id.* ¶ 6.) In August of 1999, New Life made an offer to the Securities Division to repurchase $100,000 of the unregistered securities, but that offer was rejected. (*Id.* ¶ 16, Pl.'s Resp. to Def.'s Statement of Material Facts ("PRSMF") ¶ 16.) New Life ultimately surrendered its broker-dealer license effective December 31, 1999. (PRSMF ¶ 16.) A Consent Order to that effect was executed by New Life and the Securities Division. (DSMF ¶ 16, PRSMF ¶ 16.)

New Life contends there were insurance companies in 1997 and 1998 that offered E & O policies providing "selling away" coverage and that these companies would have provided such coverage to New Life. (DSMF ¶¶ 17–18.) New Life alleges that if CSA had obtained one of these policies for New Life, New Life would have been covered with respect to the Securities Division proceeding against it and thus, would not have been "forced" to forfeit its securities license. (*Id.* ¶ 17.) Initially, New Life did not specifically name the insurers to which it referred. (*Id.* ¶¶ 18–19.) According to a deposition of New Life's expert witnesses on insurance issues, New Life relies on three policies in this matter, a policy issued by Reliance Insurance Company of Illinois ("Reliance"), a policy issued by Employers Reinsurance Corporation ("ERC"), and the American International Group, Inc. ("AIG") (67801) policy. (*Id.* ¶¶ 20–22.) Later, in a supplemental interrogatory answer, New Life furnished the following additional policies it asserts would have provided "selling away" coverage: the AIG (49596) policy, the AIG (51352) policy, the Lloyds of London policy, and the National Union policy (67279). (PRSMF ¶¶ 18–19, Ex. 1 ¶ 19). The AIG (49596) policy and the AIG (51352) policy, which are identical, were available as early as 1990 and 1991. (Pl.'s Resp. Additional Statement of Material Facts ("PRASMF") ¶¶ 51–52.) These two policies provide coverage for "selling away" because they fail to exclude these acts specifically. (*Id.*)

CSA was aware of some of these policies when it procured insurance for New Life prior to and during the years of the representative's "selling away." (*Id.* ¶¶ 46–47, 52, Ex. 6.) In 1994, CSA received a quote for New Life from AIG based on form 49596, but in discussing the quote with New Life "selling away" did not enter the conversation. (*Id.* ¶ 52; Knowles Dep. at 27.) Around June, 1997, CSA first became aware of one of the AIG policies that provided coverage for "selling away." (DSMF ¶ 27; PRASMF ¶ 40.) The coverage was designed for the "small market" broker dealers. (PRASMF ¶ 37.) Late 1997 or early 1998, CSA telephoned AIG to learn whether it could sell this new product. (DSMF ¶ 27.) AIG advised there was an exclusive arrangement with Seabury & Smith, a broker in Washington, D.C., therefore the policy would not be available to CSA. (*Id.*; Knowles Depo. at 13–16.) However, the policy was available to securities broker-dealers that were members of the National Association of Securities Dealers. (*Id.* ¶ 27.) In May 1998, the AIG policy was available through one or two Maine brokers. (PRSMF ¶ 27; Pierce Aff. ¶ 4.) By late 1998 or early 1999, CSA was able to sell the AIG policy. (PRASMF ¶ 48.) In December of 1998, CSA was also aware of and sold a CIGNA policy that provided "selling away" coverage. (*Id.* ¶¶ 46–47.)

Without naming specific polices, New Life asserts that the CNA and Zurich companies were also offering E & O policies that covered against "selling away" claims. (*Id.* ¶ 49.) New Life adds that other insurance brokers could write business for AIG and sell E & O coverage for AIG. (*Id.* ¶ 50.) These other brokers could also obtain E & O coverage offered through Seabury & Smith that would have covered New Life for "selling away." (*Id.*)

Prior to November 1998, New Life had never asked CSA to obtain coverage for "selling away." (DSMF ¶ 15.) However, New Life relied upon CSA's representations about its expertise and trusted CSA to exercise its expertise in protecting New Life's interests. (PRASMF ¶¶ 25–26.) At all relevant times, CSA did not advise New Life that "selling away" coverage was available or desirable. (*Id.*

¶¶ 38, 52.) New Life offers multiple explanations for this alleged omission. First, CSA was the only broker through which The Home Insurance would accept broker/dealer accounts. (*Id.* ¶ 54) This exclusive relationship existed because CSA and Home Insurance had jointly developed a program for coverage. (*Id.*) Second, CSA did not advise New Life regarding one of the AIG policies because coverage at first was only available from a competing insurance agency, Seabury & Smith. (*Id.* ¶ 39.) Third, CSA would have received a smaller commission if it sold New Life the AIG policy. (*Id.* ¶ 53.)

CSA concedes that it is more knowledgeable than broker-dealers in regard to the field of E & O insurance for securities broker-dealers. (*Id.* ¶ 41.) It admits having additional duties to its clients which includes a duty to "stay abreast of changes and developments" in coverage and inform its customers of such changes and developments. (*Id.* ¶¶ 31–33.) When a client does not specifically indicate the insurance that it wants, CSA will suggest some options and make recommendations for the client. (*Id.* ¶ 34.) New Life asserts that if it had obtained coverage against claims of "selling away," it would have been protected against the action taken by the Securities Division that ultimately forced it out of business. (*Id.* ¶ 43.)

### Discussion

The complaint alleges that insurance policies were available during 1997 and 1998 that provided coverage for "selling away" and had CSA procured such a policy for New Life, New Life would have been protected against the Securities Division proceeding and would not have been forced out of business. (Compl.¶¶ 47, 54–55, 57.) CSA seeks summary judgment on

the grounds that New Life, before being exposed to liability, could not have obtained an insurance policy that covered "selling away" and that no policy existed at that time that would have protected New Life from liability under the factual circumstances. (Def.'s Mot.Summ.J. ("DMSJ") at 1.) The parties agree that Maine law applies to this matter. (*See* DMSJ at 11 n. 1; Pl.'s Resp. to Def.'s Mot.Summ.J. ("PRMSJ") at 8–14 (citing Maine law).) The logical first inquiry is whether the policies New Life relies upon would have protected New Life from liability under the factual circumstances of this case. If none of the policies would have provided coverage against the Securities Division claim, it is not necessary to determine whether New Life could have qualified for these policies or whether CSA should have alerted New Life to the policies' existence.

The undisputed facts establish that none of New Life's clients has made a claim for loss resulting from the representative's 1996 and 1997 acts of "selling away." (DSMF ¶ 9.) The only action taken thus far has been by the Securities Division which brought an administrative proceeding against New Life. (PRMSJ at 13.) The Securities Division took the position that New Life inadequately supervised its representative and therefore it requested New Life to either repurchase the unregistered securities or forfeit its license to sell securities in Maine. (DSMF ¶ 12.) CSA in part claims that none of the E & O policies that New Life identifies would have provided insurance coverage under these circumstances because they either contain an exclusionary clause or define "claim" in a manner which would have prevented coverage.[2] (DMSJ at 13–16.)

---

2. CSA's motion addresses the three policies New Life brought forth in its answers to interrogatories to support its contention that there was insurance available which would have

protected it from liability when "selling away" occurred. These three policies are the ERC policy, the Reliance policy, and the AIG

New Life does not argue there is a disputed material fact but instead argues that under Maine Law the policies are ambiguous and therefore would be found to cover the Securities Division claim. (PRMSJ at 13–15.) The language of the policies will be discussed first, followed by an analysis of New Life's ambiguity argument.

## A. Whether the Language of the Policies Would Have Prevented Coverage

### 1. The AIG (67801) Policy and the National Union (67279) Policy

█ The AIG (67801) policy and the National Union (67279) policy are identical, thus they will be discussed simultaneously. (PRMSJ at 19.) CSA argues that these policies would not have covered the Securities Division claim. It appears at first glance that the policies would have covered New Life's failure to supervise its representative. (Def.'s Reply Mot. Summ.J. ("DRMSJ") Ex. H, § 1(A)(2), page 4; PRSMF Ex. 4 Policy (67279) § 1(A)(2), page 4). A provision states that the policy will pay when there is loss "arising from a Claim first made against the Broker/Dealer." (*Id.*) New Life asserts that the Securities Division claim falls within the definition of "claim" found in the policy, however, the definition states that a "claim" must be "brought by an insured's customer or client." (DRMSJ Ex. H, § 2(c), page 6; PRSMF Ex. 4 Policy (67279) § 2(c), page 6.) No such

claim exists here. (DSMF ¶ 9.) New Life argues that the Securities Division claim constitutes a claim brought by clients because the Securities Division is seeking damages or compensation for the clients rather than fines or penalties. (PRMSJ at 17.) However, this argument does not bypass the exclusionary provision, subsection (4)(o), which states that "[t]he insurer shall not be liable for Loss in connection with *any Claim* made against an insured ... brought by or on behalf of, or instigated or continued with the solicitation, assistance, participation or intervention of, any State or Federal regulatory or administrative agency or bureau or any other governmental, quasi-governmental or self-regulatory entity, whether directly or indirectly ..." (DRMSJ Ex. H, § 4(o), page 12; PRSMF Ex. 4 Policy (67279) § 4(o), page 12.) (emphasis added). There is no dispute that the Securities Division is part of the State Bureau of Banking. (DSMF ¶ 10.) Thus, in the event that New Life could have obtained the AIG (67801) policy or the National Union (67279) policy, neither policy would have protected New Life from the Securities Division's claim.

New Life relies upon Maine law suggesting that when a governmental agency is merely a "pass-through" providing dollar for dollar restitution to the "victim" in lieu of a fine or penalty, then the costs are "damages" within a policy's terms. (PRMSJ at 11–12, 14). *See also U.S. Fi-*

(67801) policy. After the discovery deadline and after the filing of CSA's Motion for Summary Judgment, New Life supplemented its answers to the interrogatory by adding numerous policies. Unsure as to which policies New Life is relying on, CSA addressed many if not all of the policies in its reply memorandum and concurrently filed a motion to strike the additional policies. (Docket No. 57.) In New Life's response to the motion to strike, New Life reports that of the newly discovered policies it only relies upon five policies: three AIG policies (49596, 51352, and 67801), a

Lloyds of London policy, and a National Union policy (67279). (Pl.'s Resp.Mot. to Strike at 4.) New Life includes these policies in its response to CSA's statement of material facts. (PRSMF ¶ 18.) The AIG (67801) policy is twice mentioned, thus there are only seven policies New Life relies on: the ERC policy, the Reliance policy, three AIG policies (49596, 51352, and 67801), the Lloyds of London policy, and the National Union policy. Accordingly, only these seven policies will be considered here.

*delity and Guar. Co. v. Goodwin,* 950 F.Supp. 24 (D.Me.1996) (noting that the Law Court has indicated in dicta that the costs incurred by an insured of cleaning-up pollution to a third party's property would be considered damages covered under an insurance policy, albeit the costs might be incurred in the context of a regulatory agency's proceeding, citing Justice Homby's decision in *Patrons Oxford Mut. Ins. Co. v. Marois,* 573 A.2d 16 (Me.1990)). Neither *Goodwin* nor *Marois* addressed the applicability of an exclusionary clause similar to the one found in these policies.

### 2. The AIG (49596) Policy, the AIG (51352) Policy, and the Reliance Policy

■ CSA asserts that these policies would not have protected New Life from liability because they contain an exclusionary clause stating that the policy does not apply to "any claim brought by or on behalf of . . . any governmental authority or any self regulatory or regulatory authority regardless of the capacity it is brought in. . . . . "[3] (DMSJ at 13; DRMSJ at 9–10, Ex. C, Policy 49596 "Exclusions" (u), page 5; Ex. C, Policy 51352 "Exclusions" (u), page 5; Ex. E, Reliance Policy "Exclusions" (u), page 4.) New Life opposes CSA's position by asserting that the policies would have covered "all sums 'resulting from any claim or claims.' " (PRMSJ at 15, 18.) New Life states that the definition of "claim" under these policies includes administrative actions in which the insured could be subject to an "adjudication of liability for loss." (*Id.*) New Life then asserts that the Securities Division had authority under the Maine statutes to bring an action for restitution

payable to the injured purchasers. (*Id.* at 15–16.) The exclusionary language however, specifically excludes "*any claim* brought by . . . any governmental authority . . . regardless of the capacity it is brought in. . . . " (DRMSJ Ex. C, Policy 49596 "Exclusions" (u), page 5; Ex. C, Policy 51352 "Exclusions" (u), page 5; Ex. E, Reliance Policy "Exclusions" (u), page 4.) (emphasis added). Consequently, none of these policies would have protected New Life from the actions taken against it by the Securities Division.

### 3. The ERC Policy

■ This policy contains an exclusion for "any proceedings against or fines or penalties levied against the Insured by a state or federal regulatory agency or self-regulatory body." (DRMSJ Ex. D, § VI. "Exclusions" (b)(12), page 8). New Life responds to CSA's exclusionary clause argument by asserting that the ERC policy, does not exclude coverage for payments made indirectly to injured parties via a "pass through manner" by the Securities Division. (*See* DMSJ at 15; PRMSJ at 16.) It relies on a provision in the policy which states that payment on behalf of the broker/dealer will be provided for "loss sustained by the Named Insured by reason of vicarious liability imposed by law for the negligent acts, errors, or omissions of its licensed agents . . . ." (PRMSJ at 16; DRMSJ Ex. D, § I. "Coverage" (b), page 3.) New Life claims that the exclusionary provision would not have defeated coverage because the Securities Division sought damages and the policy exclusion only applies to "fines and penalties levied by a regulatory body." (PRMSJ at 16.) New

---

**3.** CSA's motion for summary judgment makes this argument specifically to the Reliance policy only because, as before mentioned, these two AIG policies were added by New Life subsequent to the filing of CSA's motion. The exclusionary clause in all three policies is

identical. New Life picked up on CSA's exclusionary clause argument and addressed the exclusionary clause in these AIG policies in its opposition to summary judgment. (*See* PRMSJ at 18.)

Life ignores that the Securities Division claim for damages rises out of a proceeding against New Life by a state agency. The policy specifically excludes coverage for "*any* proceedings against … the Insured by a state or federal regulatory agency." (DRMSJ Ex. D, § VI. "Exclusions" (b)(12), page 8.) (emphasis added).

■ Furthermore, as a factual matter New Life has not shown that the Securities Division intended a dollar for dollar transfer to clients that have been harmed. The record shows that the Securities Division requested New Life to repurchase all or at least a substantial portion of the unregistered securities sold by its representative. (Zimmerman Decl. ¶ 30; Compl. ¶ 40.) However, the factual record does not indicate that all purchasers wanted to sell back their securities or have even been injured by their purchase. In fact the record suggests that a large portion of the securities the state requested New Life to repurchase are FLIC Notes that, because they were secured notes, may be paid in full by FLIC during its bankruptcy. (DSMF ¶ 11, Ex. A.) Further, $89,400 of the purchased securities was through Page & Associates which is still active. (*Id.*) There is no indication in the record that the purchasers of these securities have lost money on their purchase. Thus, the Securities Division claim may very well include costs above and beyond what New Life or an insurer would have been liable for in "damages" if the purchasers that were actually injured had brought claims directly or through the Securities Division. As the Securities Division apparently sought New Life's repurchase without regard to whether the purchasers incurred a loss, it cannot be said that the "damages" are purely compensation. Nevertheless, due to the exclusionary clause the ERC policy would not

have protected New Life from liability brought on by the Securities Division.

### 4. The Lloyds of London Policy

■ The final policy, the Lloyds of London policy specifically states in its exclusions section that it does not apply to "any claim brought by or on behalf of … any governmental authority or any self regulatory authority regardless of the capacity it is brought in…." (DRMSJ Ex. A, "Exclusions" (t), page 4.) This is the same language found in the AIG (67801) policy discussed above. This exclusionary language would have barred coverage for the actions taken against New Life by the Securities Division. Thus, assuming arguendo that New Life would have qualified for this policy, it would not have been protected from liability under these facts.

### B. Whether the Policies Are Ambiguous Under Maine Law

■ New Life claims that despite the above-discussed exclusionary clauses, Maine law would have required the insurers under these policies to provide indemnification in the Securities Division proceeding. (PRMSJ at 13.) New Life relies on the principle that Maine law favors a finding of insurance coverage when the terms of a policy are ambiguous. (*Id.* at 13.) It argues that the policies are ambiguous because they would cover the purchaser's claims for damages, had there been any, but they would exclude coverage for damages claims brought by agencies or regulatory bodies that seek compensation for purchasers.[4] (*Id.* at 14.) New Life asserts that a person of ordinary understanding would not understand that claims for damages brought directly by individuals would be covered by insurance, yet the

---

4. According to New Life, the Maine Securities Act grants the Securities Division broad authority to recover compensation for purchasers. (PRMSJ at 14.)

same damages brought by the Securities Division would not be covered. (*Id.*)

A somewhat similar point is addressed in *Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16, 18–19 (Me.1990), where the policy covered sums the insured becomes legally obligated to pay "as damages because ... of property damage...." *Id.* at 18. The question presented is whether the insurance company must indemnify the insured when remedial clean-up is ordered by a state agency to prevent property damage. The policy did not contain an exclusionary clause for claims brought by state agencies, but like the present case, there were no actual claims filed by an injured party. The court concluded that the insurance company did not have to cover the costs, and stated it did not believe that the " 'ordinarily intelligent insured,' engaged in a 'more than casual reading of the policy' would have considered [the remedial costs] to be 'sums which the insured [is] legally obligated to pay as damage.' " *Id.* (citing *Union Mut. Fire Ins. Co. v. Commercial Union Ins. Co.*, 521 A.2d 308, 310 (Me.1987)). The court acknowledges that there may be a substantial difference between the remedial costs brought by the state agency and the amount of damages the plaintiff would have to pay to property owners for damages to their property. *Id.* 18–19. The court notes that the latter expense is what the insurance premium is based upon and is what the parties contracted to cover. *Id.*

The same rational applies equally to these policies. Although the Securities Division may have intended to use the sums to "buy back" the unregistered securities from the purchasers, the undisputed fact remains that there were no claims by purchasers. (DMSJ at 9.) Further, the relevant statutory provisions state that in an administrative action brought against "control persons," such as New Life, the reme-

dy can include "[r]estitution to investors wishing restitution." 32 M.R.S.A. § 10602(3) and § 10603(1)(D). There is nothing in the record indicating that any of New Life's clients went to the Security Division to obtain relief from loss or otherwise sought restitution. *Cf. Marois*, 573 A.2d at 20 n. 9 (rejecting the argument that the state is acting as trustee on behalf of the citizens and stating that the state's actions in the administrative proceeding represent an exercise of the police power, the costs of responding to such are not customarily covered by insurance.) Moreover, it appears from the facts in the record that the Securities Division, having found that New Life failed to supervise its representative according to law, required New Life to repurchase the securities regardless of whether the purchasers had actually incurred a loss or wished to undo the transaction. Thus, the Securities Division sought "damages" that are similar to the remedial clean-up costs ordered in *Marois*.

Under Maine Law, the question of whether the language in a contract is ambiguous is a question of law. *Am. Employers' Ins. Co. v. DeLorme Pub. Co.*, 39 F.Supp.2d 64, 76 (D.Me.1999). The determination of ambiguity is made from the perspective of an ordinary or average person. *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 34 (1st Cir.2001) (citing *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 30 (1st Cir.1999) (stating that policy language is ambiguous "if an ordinary person in the shoes of an insured would not understand that the policy did not cover claims such as those brought."). Contract language is deemed ambiguous when it is "reasonably susceptible of different interpretations." *Am. Employers' Ins. Co.*, 39 F.Supp.2d at 77 (citing *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 383 (Me.1989)). Where the language of an

exclusionary clause is ambiguous, the Court must construe "the conditions and exceptions of the insurance contract, inserted therein in an attempt to limit the coverage ..., strictly against the insurer and liberally in favor of the insured...." *Id.* at 81 (citing *Patrons–Oxford Mut. Ins. Co. v. Dodge,* 426 A.2d 888, 891 (Me. 1981))).

These principles do not lead to the conclusion that the policies are ambiguous as New Life suggests. It is a stretch to conclude that an ordinary person engaged in a "more than casual reading" of the policies (*Marois,* 573 A.2d at 18), would find the policies to be ambiguous in regard to claims brought by state agencies. The exclusionary language is not reasonably susceptible to more than one interpretation; it clearly operates to deny coverage for claims brought by state agencies in any form. To find that these policies would have required the insurers to indemnify New Life where the only claim brought was by a state agency would require the Court rewrite the exclusionary portion of the policies. *See Apgar v. Commercial Union Ins. Co.,* 683 A.2d 497, 500 (Me. 1996) ("The function of the court is not to make a new contract for the parties by enlarging or diminishing its terms, but is 'to ascertain the meaning and intention of [the contract] *actually made.*' ") (citations omitted) (emphasis in original); *Golden Rule Ins. v. Atallah,* 45 F.3d 512, 516 (1st Cir.1995) ("a court may not rewrite the contract when the language employed is free of doubt.") (citing *Palmer v. Mut. Life Ins. Co.,* 324 F.Supp. 254, 257 (D.Me. 1971)).

■ Where there is no ambiguity in exclusionary language, coverage is determined in accordance with the plain meaning of the words used. *Am. Employers' Ins. Co.,* 39 F.Supp.2d at 81 (citing *Peerless Insur. Co.,* 564 A.2d at 384.) The plain language in these exclusionary provi-

sions carves out claims brought by state agencies such as the Securities Division. Thus, contrary to New Life's claim, Maine law would not have required the insurers under each of these policies to provide indemnification in the Securities Division proceeding.

■ The remaining question raised by CSA's motion is whether New Life could have qualified for any of the seven policies. In light of the foregoing analysis, there is no need to make this determination as the outcome would be the same: none of the seven policies relied on by New Life would have protected New Life from liability arising from the Securities Division claim. CSA has established that the policies would not have covered the Securities Division action. In response, New Life has not shown that there are any material facts in dispute and has not met its burden of showing that coverage was available that would have protected it from liability under the circumstances of this case. Consequently, summary judgment should be granted in CSA's favor.

### Conclusion

I recommend that the Court **GRANT** summary judgment on all counts against CSA.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

June 26, 2002.