# United States Court of Appeals
## For the First Circuit

No. 02-2348

NEW LIFE BROKERAGE SERVICES, INC., d/b/a
NLBS ADVISERS AND NEW LIFE HOLDING COMPANY, INC.,

Plaintiffs, Appellants,

v.

CAL-SURANCE ASSOCIATES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Howard, Circuit Judge,
Campbell and Cyr, Senior Circuit Judges.

Todd S. Holbrook, with whom Michael A. Hodgins and Bernstein, Shur, Sawyer & Nelson, were on brief, for appellants.
John S. Whitman, with whom Richardson, Whitman, Large & Badger, were on brief, for appellee.

June 24, 2003

**HOWARD**, **Circuit Judge**. This appeal arises out of a dispute between a defunct Maine securities broker-dealer known as New Life Brokerage Services, Inc., and its insurance broker, Cal-Surance Associates, Inc. New Life contends that the district court erred in awarding Cal-Surance summary judgment on its claims that Cal-Surance should be held liable for failing to provide it with an insurance policy that would have covered a series of events that put it out of business. We affirm, though on a different basis than that relied upon by the district court.

## I.

On or about September 2, 1997, a customer of New Life complained to the Securities Division of Maine's Bureau of Banking that one of New Life's sales representatives, Cary Butterfield, had unlawfully sold securities that were not registered with the state. The complaint prompted a Securities Division investigation that revealed that, in 1996 and 1997, Butterfield had sold some $1.3 million worth of securities that were neither registered nor approved for sale by New Life. This unlawful practice is known in the securities industry as "selling away." The Securities Division thereafter sought to revoke New Life's license as a Maine securities broker-dealer. See Me. Rev. Stat. Ann. tit. 32, § 10313(1)(J) (1999 and 2002 Supp.) (conferring this power upon the Securities Division if its administrator determines that such revocation is "in the public interest" and that the broker-dealer

"failed reasonably to supervise [its] sales representatives").

From late 1997 through 1999, New Life attempted to negotiate an agreement with the Securities Division that would permit it to retain its license. But the Securities Division conditioned any such agreement on, inter alia, New Life purchasing back from Butterfield's customers a substantial number of the unlawfully sold securities. On September 21, 1998, as negotiations were ongoing, New Life notified Zurich American, its errors and omissions insurer, of its representative's selling away and the Securities Division's investigation. The following month, Zurich American advised New Life that the policy did not provide coverage for selling away. In the absence of insurance coverage, New Life was unable to offer to purchase back a sufficient number of unlawfully sold shares to satisfy the Securities Division. Eventually, New Life acceded to the revocation of its broker-dealer license, effective December 31, 1999.

Cal-Surance had procured the New Life errors and omissions policies that were in effect annually between January 1, 1996 and January 1, 2000 -- the period during which the events underlying this lawsuit occurred. Following the surrender of its license, New Life brought this diversity action against Cal-Surance. The complaint alleged that Cal-Surance had breached duties owed to New Life to obtain for it errors and omissions insurance policies covering the selling away of unregistered and/or

unapproved securities.  At bottom, New Life's case theory was that, had Cal-Surance discharged these duties, New Life would have been able to purchase back a sufficient number of the unlawfully sold securities to avoid going out of business.

Following discovery, Cal-Surance moved for summary judgment on a number of grounds.  The district court referred the motion to a magistrate judge, who focused on Cal-Surance's argument that New Life had failed to provide evidence that there existed in the insurance market during the relevant time frame policies that would have covered the costs (or some portion thereof) of meeting the Securities Division's demands.  The magistrate judge analyzed seven insurance policies that New Life says Cal-Surance could have procured, and concluded that there were applicable exclusions within each disavowing coverage for claims or proceedings brought by governmental entities.  See New Life Brokerage Servs., Inc. v. Cal-Surance Assocs., 223 F. Supp.2d 264, 271-75 (D. Me. 2002).  Accordingly, the magistrate judge recommended that Cal-Surance's request for summary judgment be granted.  See id. at 275.  The referring judge accepted the recommendation, see id. at 266, and this appeal followed.  While we do not quarrel with the magistrate judge's reasoning and conclusions, we conclude that Maine law provides another and more direct route to affirmance, as set forth below.

Cal-Surance opens its brief not by responding to New Life's arguments against the applicability of the exclusions relied upon by the district court, but by presenting an alternative ground for upholding the judgment that it regards as more straightforward. See, e.g., Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999) (appeals court may affirm entry of summary judgment on "any ground revealed by the record"). Cal-Surance contends that each of the seven policies provided only liability coverage for "damages" or, in the case of one of the policies, "loss" (defined to include "damages, judgments, settlements, and defense costs" but not "the cost of complying with any settlement for or award of non-monetary relief") incurred as the result of legal proceedings initiated against the insured. In Cal-Surance's view, funds paid by New Life to buy back the securities would not have constituted "damages" or "loss" liability under any reasonable interpretation of these terms. New Life effectively concedes that the policies only covered liability of this sort. Its responsive argument is that the buy-back costs would have constituted "damages" or "loss" under Maine law, because they would have formed the basis for the amount of damages to which its customers would have been entitled had they sued New Life directly. See Me. Rev. Stat. Ann. tit. 32, § 10605. Cal-Surance has the stronger argument.

We give content to the contractual terms in question by adopting "the perspective of an average person untrained in either the law or the insurance field" and asking "what a more than casual reading of the policy would reveal to [this] ordinarily intelligent insured." Union Mut. Fire Ins. Co. v. Commercial Union Ins. Co., 521 A.2d 308, 310 (Me. 1987) (internal quotations omitted). Obviously, a standard as general as this is far from self-executing, but the Supreme Judicial Court of Maine has applied it in circumstances that strongly suggest that New Life's buy-back costs would not constitute "damages" or "loss" liability under Maine law.

In Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16 (Me. 1990), the Court was faced with the question whether an insurance policy providing liability coverage for amounts the insured was "legally obligated to pay as damages" would cover expenses incurred by an insured responding to a governmental demand that it eradicate pollution damage (on its own property and that of third parties) caused by its leaking underground gasoline tanks. See id. at 16-17. The Court answered this question in the negative, reasoning that there was a material difference, discernible to the ordinarily intelligent insured, between "sums which the insured [is] legally obligated to pay as damages" and the costs of conduct undertaken at government direction to restore (to the extent practicable) the status quo ante. See id. at 18. In

-6-

reaching this conclusion, the Court acknowledged that such remedial costs "may be substantial and may effectively alleviate or prevent damage to others . . . ." Id. But at the same time, the Court noted the possibility of "a substantial difference between these remedial costs and the amount of damages the [insured] would have to pay to [affected third parties] for damages," and held that it was only "the latter expenditure upon which the parties . . . contracted and upon which the premium [was] based." Id. at 18-19.

Like the equitable remedial costs in Marois, New Life's equitable remedial buy-back costs, insisted on by the Securities Division, are distinguishable from any actual direct damages that New Life would have been obligated to pay its customers. Under Marois, the payment of money does not by itself constitute loss or damage as contemplated by the policy. If anything, the circumstances presented in this case are even more dissimilar to an action seeking to impose damages or loss liability than the Marois scenario. After all, unlike the government regulator in Marois, the Securities Division had no authority under Me. Rev. Stat. Ann. § 10313(1) to order New Life to buy back the securities or otherwise to spend money to remedy the situation. See id. (conferring the power only to deny, suspend, or revoke a broker-dealer license). In any event, the Maine Supreme Judicial Court has concluded that the costs of remedial conduct required by a government agency to undo the effects of an insured's unlawful

-7-

activity, even if the conduct "alleviate[s] or prevent[s]" damages to or losses by third parties, <u>Marois</u>, 573 A.2d at 18, were not covered by an insurance policy "damages" liability provision materially indistinguishable from the policy provisions relied upon by New Life.  Having invoked the district court's diversity jurisdiction, New Life is not well positioned to argue against our reaching the same conclusion.  <u>See, e.g.</u>, <u>Dryden Oil Co. of New England, Inc.</u> v. <u>Travelers Indem. Co.</u>, 91 F.3d 278, 289 (1st Cir. 1996).

**<u>Affirmed.</u>**