PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STATE AUTO PROPERTY AND CASUALTY
INSURANCE COMPANY,
              *Plaintiff-Appellant,*

              v.

TRAVELERS INDEMNITY COMPANY OF
AMERICA; FARMINGTON CASUALTY
COMPANY,
              *Defendants-Appellees.*

No. 02-2069

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Senior District Judge.
(CA-01-73-F)

Argued: May 8, 2003

Decided: September 4, 2003

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

Vacated and remanded by published opinion. Judge King wrote the
opinion, in which Judge Wilkinson and Judge Niemeyer joined.

## COUNSEL

**ARGUED:** Patricia Pursell Kerner, BAILEY & DIXON, L.L.P.,
Raleigh, North Carolina, for Appellant. Laura Anne Brady,
DRINKER, BIDDLE & REATH, L.L.P., Florham Park, New Jersey,
for Appellees. **ON BRIEF:** Gavin B. Parsons, BAILEY & DIXON,

L.L.P., Raleigh, North Carolina, for Appellant. William T. Corbett, Jr., Mark D. Sheridan, DRINKER, BIDDLE & REATH, L.L.P., Florham Park, New Jersey; Mark A. Davis, Douglas W. Hanna, WOMBLE, CARLYLE, SANDRIDGE & RICE, Raleigh, North Carolina, for Appellees.

## OPINION

KING, Circuit Judge:

This appeal arises out of an insurance coverage dispute. In 2001, State Auto Property and Casualty Insurance Company ("State Auto") sued Travelers Indemnity Company of America and Farmington Casualty Company (collectively, "Travelers"),[1] seeking a declaration that Travelers was obligated to participate in the defense of Nissan Computer Corporation ("NCC") in a California civil action. On cross motions for summary judgment, the district court concluded that Travelers was not obligated to defend NCC. The court awarded summary judgment to Travelers, and State Auto appeals. *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, CA-01-73-F, Order (E.D.N.C. Aug. 15, 2002) (the "Order"). For the reasons explained below, we vacate and remand.

### I.

#### A.

NCC, a North Carolina corporation owned by Mr. Uzi Nissan, is engaged in the business of computer sales and services. On December 9, 1999, Nissan Motor Company, Ltd., and Nissan North America, Inc. (collectively, "Nissan"),[2] filed suit against NCC in the Central

---

[1]Travelers Indemnity Company of America and Farmington Casualty Company are affiliated insurance companies owned by the same parent corporation.

[2]Nissan Motor Company is a Japanese automaker. Nissan North America, its subsidiary, markets and distributes Nissan vehicles in the United States.

District of California. In its complaint (the "Nissan Complaint"), Nissan alleges several causes of action, each asserting NCC's wrongful utilization of the NISSAN trademark.[3]

Nissan contends that NCC, knowing that Nissan owned the NISSAN trademark, nonetheless registered the domain name[4] "www.nissan.com" in 1994 and the domain name "www.nissan.net" in 1996. Nissan Complaint ¶ 20. Nissan further alleges that "a domain name incorporating a company's trademark is a valuable asset that allows potential consumers to communicate with a particular company." *Id.* ¶ 17. According to the Nissan Complaint, NCC ultimately received between 150,000 and 200,000 visits per month to its websites from consumers searching for Nissan. *Id.* ¶ 20.

In 1999, Nissan learned that NCC was selling advertising space on its "www.nissan.com" website to automobile and other merchandising companies. Nissan alleges that, in so doing, NCC "intended to confuse consumers into thinking that these ads and links were . . . somehow affiliated with Nissan." *Id.* ¶ 22. According to the Nissan Complaint, NCC's efforts at confusion included the utilization of a logo (bearing the Nissan name) that "closely resemble[d] Nissan's logo, including the same highly distinctive typeface." *Id.* ¶ 23.

With respect to the "www.nissan.net" website, Nissan alleges that NCC utilized the NISSAN trademark in registering the domain name, and that NCC designed the website to "maximize confusion and trade off of Nissan's identity and goodwill." *Id.* ¶ 26. According to the Nissan Complaint, NCC sought to profit from this confusion by offering Internet access, hosting, and networking capabilities to visitors of the "www.nissan.net" website. *Id.* ¶ 25.

---

[3]The causes of action in the Nissan Complaint include, *inter alia*, trademark dilution, trademark infringement, domain name piracy, and false designation of origin.

[4]A domain name is an electronic address that directs Internet users to a website. *See* 15 U.S.C. § 1127.

B.

During the three-year period from July of 1993 until December of 1996, NCC was insured under an insurance policy issued by State Auto (the "State Auto Policy"). For the next three years, from December of 1996 until December of 1999, NCC was insured under four policies issued by Travelers (collectively, the "Travelers Policy").[5] The Travelers Policy provides coverage[6] for any "'[a]dvertising injury' caused by an offense committed in the course of advertising [NCC's] goods, products or services." J.A. 77. It defines "advertising injury" to include, among other things, harm caused by NCC's "[m]isappropriation of advertising ideas or style of doing business." *Id.* at 84.[7]

The Travelers Policy contains several provisions that limit Travelers's duty to provide coverage to NCC. Three of those provisions are relevant to the present controversy. First, the Travelers Policy excludes coverage for any advertising injury "[a]rising out of oral or written publication of material, if done by or at the direction of the 'insured' with knowledge of its falsity" (the "Falsity Exclusion"). *Id.* at 78. Second, it excludes coverage for advertising injuries arising out of an "offense committed by an 'insured' whose business is advertising" (the "Business of Advertising Exclusion"). *Id.* Finally, the Travelers Policy provides that NCC must, "as soon as practicable," notify Travelers "of an 'occurrence' or an offense which may result in a claim" (the "Notice Provision"). *Id.* at 81.

---

[5]In December of 1996, NCC was named as an insured on an insurance policy issued by Travelers to The Internet Center, Incorporated, an affiliate of NCC. That policy was renewed in May of 1997, and Travelers thereafter issued two successive one-year policies to NCC, effective from December of 1997 until December of 1999. The provisions of these policies are identical in all material respects.

[6]In using the term "coverage," we refer both to the duty of an insurer to defend and to its duty to indemnify.

[7]The State Auto Policy is identical in all material respects to the Travelers Policy. Most notably, the State Auto Policy and the Travelers Policy each define "advertising injury" as the "[m]isappropriation of advertising ideas or style of doing business."

C.

The Nissan Complaint was filed on December 9, 1999. Four days later, on December 13, 1999, NCC notified Travelers thereof. Travelers then refused to defend NCC, maintaining that the Travelers Policy did not provide coverage for the claims asserted in the Nissan Complaint. State Auto, by contrast, agreed to defend NCC on the Nissan Complaint, though it did so under a reservation of rights.[8]

In January of 2001, State Auto filed this declaratory judgment action in the Eastern District of North Carolina, invoking the court's diversity jurisdiction and seeking a declaration that Travelers is obligated to participate in NCC's defense. State Auto contends that the Nissan Complaint alleges an "advertising injury," as that term is defined in the Travelers Policy, and that Travelers is thus contractually bound to defend NCC.

At the close of discovery, State Auto and Travelers filed cross motions for summary judgment. After briefing on the motions, the district court ruled in favor of Travelers, concluding that the Nissan Complaint did not allege an "advertising injury," and that, in any event, Nissan's alleged injuries were not the result of NCC's advertisement of NCC's own goods, products, or services, as required under the Travelers Policy. Order at 15. Accordingly, the court denied State Auto's motion for summary judgment and awarded summary judgment to Travelers. *Id.* State Auto thereafter filed a motion to alter or amend the judgment, which was denied. *State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, CA-01-73-F, Order (E.D.N.C. Oct. 9, 2002). State Auto has appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review de novo a district court's award of summary judgment. *See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1127-28 (4th Cir.

---

[8]When an insurer defends its insured under a "reservation of rights," the insurer is generally reserving its right to discontinue the defense or to deny indemnification if it is later determined that the insurer is not obligated to provide coverage.

1987). At the summary judgment stage, we construe the underlying facts in the light most favorable to the non-moving party. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 928 (4th Cir. 1995). We may uphold an award of summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### III.

State Auto contends that the Nissan Complaint alleges an "advertising injury," as that term is defined in the Travelers Policy, and that Travelers is thus obligated to participate in NCC's defense. Travelers, by contrast, maintains that the Nissan Complaint fails to allege an "advertising injury." In the alternative, Travelers contends that the Falsity Exclusion and the Business of Advertising Exclusion apply, and that it is thus not obligated to provide coverage. Moreover, Travelers asserts that NCC failed to comply with the Notice Provision, and that it thereby forfeited its right to a defense. In order to determine whether Travelers is obligated to participate in NCC's defense, we first review some basic principles of North Carolina insurance law.

### A.

An insurance policy is a contract, and its provisions govern the rights and duties of the parties thereto. *Fid. Bankers Life Ins. Co. v. Dortch*, 348 S.E.2d 794, 796 (N.C. 1986). Pursuant to North Carolina law, the interpretation of an insurance policy is a question of law that is appropriate for resolution on summary judgment. *See generally Royal Ins. Co. of Am. v. Cato Corp.*, 481 S.E.2d 383 (N.C. Ct. App. 1997). Further, provisions in a policy "which extend coverage to the insured must be construed liberally so as to afford coverage whenever possible by reasonable construction." *N.C. Farm Bureau Mut. Ins. Co. v. Stox*, 412 S.E.2d 318, 321 (N.C. 1992).

Any ambiguity as to the meaning of a policy term "must be resolved in favor of the policyholder, or the beneficiary, and against the company." *Wachovia Bank & Trust Co. v. Westchester Fire Ins. Co.*, 172 S.E.2d 518, 522 (N.C. 1970). An ambiguity exists where

"the language of the policy is fairly and reasonably susceptible to either of the constructions for which the parties contend." *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co.*, 340 S.E.2d 374, 379 (N.C. 1986). A "difference of judicial opinion regarding proper construction of policy language is some evidence" that a policy provision is ambiguous. *Brown v. Lumbermens Mut. Cas. Co.*, 390 S.E.2d 150, 153 (N.C. 1990); *see also Maddox v. Colonial Life & Acc. Ins. Co.*, 280 S.E. 2d 907, 910 (N.C. 1981) ("We feel the fact that the courts of other jurisdictions have reached conflicting interpretations emphasizes the ambiguity inherent in the [policy provision]."). Where a term is not defined in an insurance policy, the court "must define the term in a manner consistent with the context in which it is used and the meaning accorded it in ordinary speech." *Id.* at 909. Where a policy term has more than one meaning, and "the context does not indicate clearly the one intended, it is to be given the meaning most favorable to the policyholder." *Wachovia*, 172 S.E.2d at 522.

Generally, an insurer's duty to defend the insured is broader than its duty to indemnify. *Waste Mgmt.*, 340 S.E.2d at 377. In particular, the duty to defend "is ordinarily measured by the facts alleged in the pleadings; its duty to pay is measured by the facts ultimately determined at trial." *Id.* Importantly, in assessing an insurer's duty to defend, "the ultimate focus . . . is on the facts that are pled, not how the claims are characterized." *Holz-Her U.S., Inc. v. U.S. Fid. & Guar. Co.*, 539 S.E.2d 348, 350 (N.C. Ct. App. 2000). Moreover, where a complaint alleges multiple claims and injuries, some of which are covered and some of which are not, an insurer is obligated to defend its insured against all claims made in the lawsuit. *Wa. Hous. Auth. v. N.C. Hous. Auth. Risk Retention Pool*, 502 S.E.2d 626, 629 (N.C. Ct. App. 1998).

## B.

As noted above, the Travelers Policy defines "advertising injury" to include the "[m]isappropriation of advertising ideas or style of doing business." Further, it provides coverage only for those advertising injuries "caused by an offense committed in the course of advertising [NCC's] goods, products or services." Accordingly, in assessing whether Travelers is obligated to defend NCC, we must determine (1) whether any injury alleged in the Nissan Complaint

constitutes an "advertising injury" as that phrase is defined by the Travelers Policy; and (2) whether Nissan's injuries occurred in the course of NCC's advertisement of its own goods, products, or services. We address each of these questions in turn.

1.

In assessing whether any of Nissan's injuries constitutes an "advertising injury" under the Travelers Policy, we must determine whether the Nissan Complaint alleges the "misappropriation of advertising ideas or style of doing business."[9] Travelers maintains that the term "misappropriation," as used in the Travelers Policy, refers only to the common law tort of misappropriation, which does not protect against injuries resulting from the wrongful use of a trademark. Independently, Travelers contends that a trademark is neither an advertising idea nor a style of doing business. Given these contentions, we must, in assessing whether the Nissan Complaint alleges the "misappropriation of advertising ideas or style of doing business," make two inquiries: (1) whether "misappropriation" under the Travelers Policy is limited to common law misappropriation, or whether it encompasses any claim related to the wrongful use of a trademark; and (2) whether a trademark can constitute an advertising idea or a style of doing business.

a.

The common law tort of misappropriation provides a remedy for the appropriation of "some item or creation of the plaintiff which is

---

[9]In 1986, the Insurance Services Office (the "ISO"), a national insurance policy drafting organization, amended the definition of "advertising injury" that it employed in its standard commercial general liability policy. *See* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 33:5 (4th ed. 2003). The ISO's amended definition of "advertising injury" covers those injuries arising from the "[m]isappropriation of advertising ideas or style of doing business." *Id.* As noted, this definition is used in the Travelers Policy and its meaning is at issue in this proceeding. The language suggested by the ISO is widely used, and several courts have had occasion to interpret the "misappropriation" clause as it appears in the Travelers Policy.

not protected by . . . trademark law." J. Thomas McCarthy, *McCarthy's Desk Encyclopedia of Intellectual Property* 206 (1991). Thus, common law misappropriation does *not* provide any remedy for an injury related to trademark infringement. Travelers contends that the Travelers Policy implicitly adopted the common law definition of misappropriation. Travelers therefore asserts that, because the Nissan Complaint relates solely to NCC's wrongful use of the NISSAN trademark, Nissan is not suing for "misappropriation," as that term is defined in the Travelers Policy. State Auto maintains, on the other hand, that "misappropriation" refers to any wrongful acquisition of property.

Although North Carolina has not had occasion to construe the term "misappropriation" in this context, it has broadly interpreted a similar phrase ("unfair competition") in the insurance context — refusing to limit that phrase to its common law definition. *See Henderson v. U.S. Fid. & Guar. Co.*, 488 S.E.2d 234, 240 (N.C. 1997). In its *Henderson* decision, the Supreme Court of North Carolina decided that the term "unfair competition," as used in a commercial insurance policy, encompasses statutory claims of unfair and deceptive trade practices, as well as the tort of common law unfair competition. The court observed that "a person reading the term 'unfair competition' as a category of 'advertising injury' within an insurance policy would not necessarily understand the term to be limited to a common law definition." *Id.* at 238-39 (internal quotation marks omitted). In the court's view, there was "no valid reason to exclude conduct described in the statute simply because it might not be regarded as unfair competition in a common law sense." *Id.* at 239. In light of the *Henderson* decision, the Supreme Court of North Carolina is unlikely to construe the term "misappropriation," as used in the Travelers Policy, to be limited to the common law definition.

Furthermore, the majority of those courts which have interpreted the term "misappropriation," in this context, conclude that misrepresentation refers to wrongful acquisition generally, rather than to common law misappropriation only. *Cf.* Ernest Martin, Jr. et al., *Insurance Coverage for the New Breed of Internet-Related Trademark Infringement Claims*, 54 SMU L. Rev. 1973, 1994 (2001) ("[T]he vast majority [of courts] have concluded that trademark infringement falls within the meaning of ['misappropriation of adver-

tising ideas or style of doing business'].""). For example, the Eleventh Circuit was "unconvinced by [the insurer's] argument that 'misappropriation' covers only injuries actionable under the common law tort of 'misappropriation.'" *Hyman v. Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1189 (11th Cir. 2002). The court reasoned that there was "no indication in the policy that the phrase was intended to be so limited," and that "the ordinary meaning of the term misappropriation encompasses a wider spectrum of harms." *Id.* Similarly, in *Adolfo House Distributing Corp. v. Travelers Property & Casualty Insurance Co.*, 165 F. Supp. 2d 1332 (S.D. Fla. 2001), the court reasoned that, even assuming that "misappropriation" could refer solely to common law misappropriation, it was "at least equally reasonable" to conclude that the term referred more generally to wrongful acquisition. *Id.* at 1340 n.3. Accordingly, the court decided that the term must be given "the interpretation which provide[d] the most coverage." *Id.*; *Cat Internet Servs., Inc. v. Providence Washington Ins. Co.*, 333 F.3d 138, 142 (3d Cir. 2003) (holding that policy covering "misappropriation of advertising ideas" entitled insured to coverage for trademark infringement claim); *Bay Elec. Supply, Inc. v. Travelers Lloyds Ins. Co.*, 61 F. Supp. 2d 611, 617 (S.D. Tex. 1999) (same); *Am. Employers' Ins. Co. v. Delorme Publ'g Co., Inc.*, 39 F. Supp. 2d 64, 76-77 (D. Me. 1999) ("*Delorme*") (interpreting "misappropriation" in this context to refer to "wrongfully 'tak[ing] or mak[ing] use of without authority or right'" (quoting *Webster's New Collegiate Dictionary* 98, 758 (9th ed. 1987)).

Finally, the term "misappropriation" is necessarily ambiguous: Although it could refer specifically to the common law tort of misappropriation, it also could refer more generally to the wrongful acquisition of property.[10] Significantly, the courts in other jurisdictions are unable to agree on how to interpret the term "misappropriation." *Compare Hyman*, 304 F.3d at 1189, *with Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 802 (6th Cir. 1996). And perhaps most compelling, the insurance companies involved in this coverage dispute disagree on the interpretation to be accorded the term "misap-

---

[10]Had Travelers intended to "limit its exposure for 'misappropriation' to suits arising under the common law tort of misappropriation, it was incumbent upon it to do so unambiguously." *Adolfo*, 165 F. Supp. 2d at 1340 (interpreting policy provision identical to that in Travelers Policy).

propriation" in this context. Although the State Auto Policy and the Travelers Policy define "advertising injury" identically, State Auto acknowledges that it is obligated to defend NCC against the Nissan Complaint, while Travelers takes the contrary position. Under North Carolina law, such an ambiguity must be "resolved in favor of the policyholder." *Wachovia*, 172 S.E.2d at 522.[11]

In sum, we conclude, for several reasons, that the term "misappropriation" in the Travelers Policy refers generally to the wrongful acquisition of property. First, and most importantly, the Supreme Court of North Carolina has indicated that it would adopt this view. *See Henderson*, 488 S.E.2d at 240. Second, most of the courts interpreting the term "misappropriation" in the "advertising injury" context have interpreted the term as we do here. Finally, the ambiguity in the term "misappropriation" must be interpreted in favor of coverage.

b.

We must next decide whether the NISSAN trademark can be construed either as an advertising idea or as a style of doing business. This is the next step in our inquiry because, as noted above, the Travelers Policy provides coverage only for the misappropriation of "advertising ideas" or "style of doing business." In these circumstances, the Nissan Complaint alleges the wrongful use by NCC of the NISSAN trademark. Thus, if Travelers is to be obliged to defend NCC, the NISSAN trademark must qualify as an advertising idea or a style of doing business.

A trademark serves at least four distinct functions: (1) it identifies and distinguishes a seller's goods; (2) it indicates that all goods bear-

---

[11]We recognize and reject the minority view that trademark claims do not involve "misappropriation." *See Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 802 (6th Cir. 1996); *Callas Enters. v. Travelers Indem. Co. of Am.*, 193 F.3d 952, 957 (8th Cir. 1999); *Nationwide Mut. Ins. Co. v. Mortensen*, 222 F. Supp. 2d 173, 185 (D. Conn. 2002). The Sixth Circuit's holding in *Advance Watch*, limiting "misappropriation" to its common law definition, has been sharply criticized by other courts. *See Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 747 (3d Cir. 1999).

ing the mark derive from the same source; (3) it signifies that all goods bearing the mark are of the same quality; and (4) it serves as a prime instrument in the advertisement and sale of the seller's goods. 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:2 (4th ed. 2003). Accordingly, a trademark plays an important role in advertising a company's products. Thus, at the very least, a trademark has the potential to be an advertising idea. *See, e.g.*, *Cat Internet Servs.*, 333 F.3d at 138 (concluding that trademarks can qualify as "advertising ideas or style of doing business"); *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 749 (3d Cir. 1999) ("A trademark can be seen as an 'advertising idea': It is a way of marking goods so that they will be identified with a particular source."); *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*, 59 Cal. Rptr. 2d 36, 44 (Cal. Ct. App. 1996) ("[O]ne of the basic functions of a trademark is to *advertise* the product or services of the registrant." (emphasis in original)).[12]

In this situation, we have a quintessential example of a trademark functioning to advertise a company's products. The NISSAN mark promotes Nissan's vehicles to the public. As the Nissan Complaint states, Nissan "vigorously advertised, promoted and developed its NISSAN trademark — routinely spending hundreds of millions of dollars each year." Nissan Complaint ¶ 11. As a result of Nissan's "high-profile promotion of the NISSAN mark, the mark has become instantly recognizable throughout the United States and the world as a symbol of high-quality automobiles." *Id.* ¶ 12. Thus, the NISSAN trademark is an advertising idea and, as a consequence, the injuries alleged in the Nissan Complaint fall within the Travelers Policy's definition of an "advertising injury."[13]

---

[12]We do not accept the view that a trademark is merely a label or an identifier, rather than an advertising idea or a "style of doing business." *See, e.g.*, *Sport Supply Group v. Columbia Cas. Co.*, 335 F.3d 453, 463 (5th Cir. 2003) (concluding that trademark at issue "serves primarily to *identify and distinguish*" plaintiff's products, and is not "a 'marketing device[ ] designed to induce the public to patronize' establishments" with plaintiff's products (emphasis and alterations in original)). A trademark, by identifying and distinguishing the trademark holder's products, promotes those products to the public. *See Frog, Switch*, 193 F.3d at 749.

[13]The "advertising injury" definition in the Travelers Policy also includes injuries arising from the "[i]nfringement of copyright, title or

2.

Having determined that the injuries Nissan alleged constitute advertising injuries, our next inquiry is whether those injuries were caused by an offense committed "in the course of advertising [NCC's] goods, products or services," as the Travelers Policy requires. On this point, Travelers contends that, because the allegations in the Nissan Complaint relate to NCC's utilization of the NISSAN trademark in NCC's registration of domain names, and because domain names are simply website addresses, Nissan's injuries did not occur in the course of NCC's advertising. Further, Travelers maintains that, even assuming that the offenses alleged were committed in the course of advertising, the advertising was not of NCC's own goods, products, or services, but rather the goods, products, or services of other companies.

a.

Travelers first contends that Nissan's injuries did not occur in the course of advertising. The term "advertising" normally refers to "'[a]ny oral, written, or graphic statement made by the seller in any manner in connection with the solicitation of business.'" *Elan Pharm. Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1377 (11th Cir. 1998) (quoting *Black's Law Dictionary* 54 (6th ed. 1990)). Travelers asserts, and the district court agreed, that because the injuries suffered by Nissan relate solely to NCC's use of the "www.nissan.com" and "www.nissan.net" domain names, and because a domain name is "nothing more than an 'address' or a locator for accessing a web site," NCC's injurious conduct did not itself constitute "advertising." Order at 11. As explained below, we disagree with the court's conclusion that Nissan's injuries did not occur in the course of advertising.

First, although the primary thrust of the Nissan Complaint relates to NCC's use of the NISSAN trademark in NCC's domain names,

_____

slogan." J.A. 84. State Auto contends that Nissan's injuries also arose from the "[i]nfringement of . . . title." Because we conclude that coverage exists under the "misappropriation of advertising ideas or style of doing business" clause of the Travelers Policy, we need not reach the "infringement of . . . title" issue.

Nissan also challenges NCC's use of the trademark in its logo on the "www.nissan.com" website. Nissan Complaint ¶ 23. The logo easily qualifies as a graphic statement and, because it was on the "www.nissan.com" website, where NCC was soliciting business for itself and for others, it was utilized "in connection with the solicitation of business." *Elan*, 144 F.3d at 1377. As a result, any injuries that Nissan suffered by virtue of NCC's use of the logo on the "www.nissan.com" website were injuries that occurred "in the course of advertising."

   Even if the Nissan Complaint had been limited to challenging NCC's registration of domain names, we would nevertheless conclude that Nissan's injuries occurred in the course of NCC's advertising. The phrase "in the course of" extends coverage beyond those injuries that resulted from NCC's actual advertisements. The use of a domain name to lead consumers to advertisements on NCC's websites is clearly an act that occurs "in the course of" advertising. Here, the Nissan Complaint alleged that NCC infringed the NISSAN trademark when it used the domain names "www.nissan.com" and "www.nissan.net," and that NCC then employed the offending websites for advertisement purposes. Nissan Complaint ¶¶ 20, 22, 25. As such, the injuries complained of by Nissan occurred "in the course of" NCC's advertising.[14]

b.

   Because the Nissan Complaint alleges injuries that were caused by an offense committed in the course of advertising, we must next assess whether the advertising was of NCC's own goods, products, or services, as required for coverage under the Travelers Policy. The district court premised its summary judgment ruling in favor of Travel-

---

[14]Several courts have viewed claims for trademark infringement as *necessarily* involving an insured's advertising activities. *See Delorme*, 39 F. Supp. 2d at 74; *see also Hyman*, 304 F.3d at 1194 n.11 (observing that "[s]everal courts have found that 'trademark and trade dress infringement inherently involve advertising activity'"). We need not decide, however, whether a claim against an insured for trademark infringement will always involve the insured's advertising activities. It is sufficient that, in this case, the Nissan Complaint challenged NCC's advertising activities.

ers, in part, on its determination that the Nissan Complaint fails to allege that NCC's infringing conduct occurred during the course of advertising its own goods, products, or services. The court concluded that Nissan "complains of NCC's conduct in relation to its selling advertisements for *someone else's* goods, products or services." Order at 11-12 (emphasis in original).

Although a significant portion of the allegations in the Nissan Complaint relate to advertisements on the "www.nissan.com" website for "automobile and other merchandising companies," Nissan Complaint ¶ 22, Nissan also alleges injuries that relate to NCC's advertisement of its own services, namely its offering of "Internet access, hosting, and networking capabilities" to visitors of its "www.nissan.net" website. *Id.* ¶ 25 ("Seeking to profit from this confusion, NCC purports to offer Internet access, hosting, and networking capabilities to visitors [to the www.nissan.net website]."); *see also id.* ¶ 29 ("It is therefore apparent that, in registering the domain names 'nissan.com' and 'nissan.net,' and using them in connection with ad links to car and other merchandising websites, *or to offer Internet services*, NCC falsely represented and warranted to [Network Solutions, Inc.] that it had the right to register these domain names." (emphasis added)). Accordingly, the Nissan Complaint alleges that Nissan's injuries arose, at least in part, from NCC's advertisement of NCC's own goods, products, and services.

## C.

Travelers next contends that, even if the injuries alleged in the Nissan Complaint fall within the definition of "advertising injury" in the Travelers Policy, and even if those injuries occurred in the course of NCC's advertisement of its own goods, products, and services, we should affirm the award of summary judgment because of the Falsity Exclusion, the Business of Advertising Exclusion, and NCC's failure to comply with the Notice Provision. We address each of these contentions in turn.

### 1.

Travelers first asserts that, under the Falsity Exclusion, it is not obligated to defend NCC in the suit brought by Nissan. Pursuant to

the Travelers Policy, NCC is not entitled to coverage for an "advertising injury . . . [a]rising out of oral or written publication of material, if done by or at the direction of the 'insured' with knowledge of its falsity." J.A. 78. Travelers maintains that each cause of action in the Nissan Complaint alleges that NCC acted intentionally and willfully in misleading consumers, and that the Falsity Exclusion therefore applies.

Because the Travelers Policy fails to define the policy term "falsity," we "must define the term in a manner consistent with the context in which it is used and the meaning accorded in ordinary speech." *Maddox*, 280 S.E.2d at 909. As the Eleventh Circuit observed in assessing a similar contention, the term "false" is generally understood to mean "'untrue' or failing to correspond to a set of known facts." *Hyman*, 304 F.3d at 1195. There is no allegation in the Nissan Complaint that the advertisements contained on the "www.nissan.com" and "www.nissan.net" websites were "untrue." Nor is there anything "untrue" about the domain names themselves. Rather, Nissan contends that the website gave a false impression or misled visitors to believe that its contents were sponsored by Nissan. As the Eleventh Circuit observed, although "a court *could* construe the term 'false' to encompass conduct or statements arguably giving rise to a false or misleading impression, . . . [s]uch a definition . . . is significantly broader than one including only direct assertions of untrue facts, and [it is] no more plausible." *Id.* at 1196. Because North Carolina law directs us to construe ambiguous policy provisions in favor of coverage, we cannot read the Falsity Exclusion so broadly as to encompass allegedly misleading conduct. Accordingly, it does not apply in this situation.[15]

2.

Travelers next contends that it has no duty to defend NCC against the Nissan Complaint because NCC's "business is advertising," and

---

[15]Indeed, it "is questionable in the first instance . . . whether [the Falsity Exclusion] applies to all advertising injuries, or only to libel, slander, and invasion of privacy; it has been suggested that this exclusion is more logically relevant to the latter." *Adolfo*, 165 F. Supp. 2d at 1341 (interpreting identical provision of commercial insurance policy).

the Business of Advertising Exclusion therefore applies. The Business of Advertising Exclusion provides that the Travelers Policy does not cover advertising injuries arising out of an "offense committed by an 'insured' whose business is advertising." J.A. 78. According to Travelers, the Business of Advertising Exclusion applies "to those insureds, like NCC, that engage in any type of advertising for others as a revenue-generating *business*." Appellee's Br. at 56 (emphasis in original). We disagree.

The Business of Advertising Exclusion applies to those insureds, and only to those insureds, whose principal or primary business is advertising. The "phrasing 'insureds whose business is . . .' clearly contemplates that the insured is more than just, in part, engaged in" advertising. *Delorme*, 39 F. Supp. 2d at 81 (interpreting, under Maine law, similar insurance policy provision). By the same token, however, we do not view the Business of Advertising Exclusion as limited to those insureds whose *sole* business is advertising. As the *Delorme* court recognized, "[m]ost, if not all, businesses are engaged in multiple areas of business even if they primarily practice in one area." *Id.* Instead, the logical interpretation is that the Business of Advertising exclusion "applies to insureds whose primary, essential, chief or principal business" is advertising. *Id.* Although NCC sold advertising space on its websites, its principal business was computer sales and services. Accordingly, the Business of Advertising Exclusion does not excuse Travelers from its obligation to defend NCC.

3.

Finally, Travelers maintains that it is not obligated to defend NCC against the Nissan Complaint because NCC failed to comply with the Notice Provision in the Travelers Policy. Pursuant to the Travelers Policy, NCC is required to notify Travelers "as soon as practicable of an 'occurrence' or an offense which may result in a claim." J.A. 81. Although Travelers acknowledges that NCC gave notice within days of the filing of the Nissan Complaint, it contends that NCC should have provided notice to Nissan four years earlier in 1995.

In particular, Travelers contends that a July 11, 1995 letter (the "Nissan Letter") from Nissan to NCC regarding NCC's registration of

the domain name "www.nissan.com" could "result in a claim."[16] Appellee's Br. at 59. In the Nissan Letter, Nissan advised NCC of its concern that NCC had "chosen to use 'NISSAN' as part of [NCC's] domain name on the Internet." The Nissan Letter also requested "additional information about [NCC's] business and the manner in which [its] domain name [was] used."

North Carolina applies a three-part test to determine whether an insurer may be relieved of its obligation to defend and indemnify its insured due to tardy notice of a claim. *See Great Am. Ins. Co. v. C.G. Tate Constr. Co.*, 340 S.E.2d 743, 746-47 (N.C. 1986). First, an insurer must demonstrate that the notice provided by its insured was untimely. *Id.* at 746. Second, if the insurer shows that notice was untimely, the insured must then demonstrate that the delay was "occasioned in good faith." *Id.* at 747. Finally, if the insured is found to have acted in good faith, the insurer's contractual duties will nonetheless be discharged if the insurer can show that it was prejudiced by the delay in notification. *Id.* at 746.

In this instance, NCC provided notice of the Nissan Complaint to Travelers. The 1995 Nissan Letter neither threatened NCC with a lawsuit nor asserted that NCC's registration of the "www.nissan.com" domain name was wrongful. Instead, it merely sought information regarding NCC's business and its use of the "www.nissan.com" domain name. In these circumstances, the Nissan Letter did not give notice to NCC of a possible claim, and NCC was not obliged to notify Travelers thereof. And, as Travelers acknowledges, NCC notified Travelers of the Nissan Complaint within days of its filing. In so doing, NCC provided Travelers with proper notice under the Travelers Policy.[17] We therefore reject the contention that NCC failed to comply with the Notice Provision.

---

[16]The Nissan Letter related solely to the "www.nissan.com" domain name. It was not until 1996 that NCC registered the "www.nissan.net" domain name.

[17]State Auto also contends that the district court erred in denying its motion to alter or amend the judgment. Because we vacate the summary judgment award to Travelers, this issue is moot.

## IV.

Pursuant to the foregoing, we vacate the summary judgment award to Travelers, and we remand for such further proceedings as may be appropriate.

*VACATED AND REMANDED*